# EXHIBIT E

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DISTRICT

JENNIFER PELLOW as Personal Representative of the Estate of NATHAN WESLEY PELLOW,

Plaintiff,

vs.

Case No. 15-11675

Hon. Terrance G. Berg

Magistrate R. Steven Whalen

KEVIN BARNHILL, SHANE McKIBBEN, ROBERT ROY, JOHN ADAMS, and DALE VAN HORN, Jointly and Severally,

Defendants.

_________________________________/

PAGE 1 TO 38

The Deposition of BRIAN JACOBS,

Taken at One City Square, Fourth Floor,

Warren, Michigan,

Commencing at 10:05 a.m.,

Wednesday, August 17, 2016,

Before Gail R. McLeod, RPR, CSR 2901.

APPEARANCES:

MR. JOEL B. SKLAR P38338
Law Office of Joel B. Sklar
615 Griswold Street, Suite 1116
Detroit, Michigan 48226
(313) 963-4529
joel@joelbsklarlaw.com
Appearing on behalf of the Plaintiff.

MR. BEN M. GONEK P43716 (NOT PRESENT)
Law Offices of Ben Gonek, P.L.L.C.
615 Griswold Street, Suite 1116
Detroit, Michigan 48226
(313) 963-3377
Appearing on behalf of the Plaintiff.

MS. JULIE L. DRUZINSKI P72015
Garan Lucow Miller, P.C.
1155 Brewery Park Boulevard, Suite 200
Detroit, Michigan 48207
(313) 446-5514
jdruzinski@garanlucow.com
Appearing on behalf of the Defendants.



ALSO PRESENT:
Jennifer Pellow

* * * * *



TABLE OF CONTENTS


| BRIAN JACOBS | Page |
| --- | --- |
| EXAMINATION BY MR. SKLAR: | 5 |
| EXAMINATION BY MS. DRUZINSKI: | 29 |
| RE-EXAMINATION BY MR. SKLAR: | 31 |


INDEX TO EXHIBITS
(Exhibits attached to transcript)


| Exhibit | Page |
| --- | --- |
| DEPOSITION EXHIBITS 1 AND 2<br>- Witness Statement<br>- PCR | 36 |




Warren, Michigan
Wednesday, August 17, 2016
About 10:05 a.m.

BRIAN JACOBS,

having first been duly sworn, was examined and testified on his oath as follows:

MR. SKLAR: Let the record reflect that this is the discovery deposition of Brian Jacobs taken pursuant to Notice to be used for all purposes allowed by the Federal Court Rules and any related statutes.

EXAMINATION BY MR. SKLAR:

Q. Mr. Jacobs, have you ever had your deposition taken before?

A. Negative.

Q. And just to give you a basic outline of what it really is is a deposition is just an opportunity for lawyers to find out what a witness knows. If there's a question I ask you that doesn't make sense or you can't understand it, it's just poorly phrased, that happens all the time, just tell me and I'll try to rephrase it.

You're probably going to know where I'm going, but just let me get the question out before you give a response. All right? You have to give verbal responses, yes or nos or words because the record can't reflect nods and shakes of the head and such.

Page 6

So if you need a break at any time, I don't think it's going to be way too long, so you shouldn't need one, but if you do, just let me know and you're more than welcome to take one. All right?

A. Okay.

Q. Before we get going, I just want to let you know we did attempt to take the police officers' depositions in this case. Each officer asserted his Fifth Amendment right against self incrimination and didn't answer any questions. I just wanted to advise you of that and acknowledge it. Are you asserting your Fifth Amendment right to any questions today or not?

A. No.

Q. Okay. Good. So let's start here. Where are you employed?

A. Warren Fire Department.

Q. And for how long have you been employed?

A. Three years and a couple months.

Q. So this incident happened on August 30, 2013, so it would have been one year earlier?

A. Yeah, it was within the first year. I'd been there for a few months I believe.

Q. Okay. Good. And what is your position?

A. At that point?

Q. Yes.

Page 7

A. Probationary firefighter and a paramedic. We're responsible for both medical and fire response.

Q. Okay. And who were -- and if you can do this briefly and I'll try to make it easy, who was your immediate supervisor?

A. Captain Curtis Thrift.

Q. And is there anybody above Captain Curtis Thrift?

A. We have chiefs of the department, battalion chiefs, but he was my immediate acting supervisor.

Q. In preparation for your deposition today, have you reviewed any documents?

A. I read the PCR that I wrote and the incidents that we had from that day just to refresh on details.

Q. So that would have been -- I think I have both of those documents. Did you review any other documents?

A. I don't think there are any other documents to review so --

Q. Okay. Did anybody at any time ask you to prepare any written documents or written reports for this other than the PCR?

A. I've written nothing on it other than the stuff we wrote that day.

Q. There was a witness statement you wrote as well?

A. I'd have to look at it to know, but I'm pretty sure it was just the PCR, the Patient Care Report, and our

Page 8

incident report is what I wrote I think.

Q. So let's start with this. Did you have a crew on the 30th of August 2013 that you worked with or do you kind of work alone?

A. We work with a crew. So each station, each house is by unit, a crew that we work with. So Captain Curtis Thrift was always my boss. Ted Garwood was always our FEO, the guy who drives the fire engine. My partner was James Muirhead. Our FEO, which is fire engine operator, he drives the engine. He's a paramedic as well, Ted Garwood. James Muirhead is my partner on the ambulance with me. The squad, all those were the same peoples as always.

Q. And has anybody from the City of Warren, either the PD or any other department, interviewed you about your interaction with Mr. Pellow?

A. No.

Q. So you never spoke to Captain Metheny?

A. No.

Q. Did you ever speak to, other than -- well, we'll go to the date of the accident. Have you spoken to any police officers about what happened with Pellow at all?

A. No.

Q. Okay. And tell me how you first became involved in the Nathan Pellow matter.

Page 9

A. When we went on the run that day, I was there.

Q. Because I'm not familiar with what you do or how it works, you how do you first get word that there's an incident you have to respond to?

A. So at the station, dispatch will call us out, basically just a noise at the station, alert everyone we have a run, be it medical or fire or whatever. Then dispatch will come over the air. There are speakers in each of the stations that literally tells us what the run is, the run number, the time in which we're going, everything to that effect.

Q. And you got a word that or notice that there was an incident on Nuway or what street did you --

A. Honestly, I can't recall. I know it was in the trailer park off of Ten Mile. I can't remember which specific street. I don't remember specifics like that.

Q. That's fine. And I take it did you and your crew go to the scene?

A. Correct. Any time we have a medical or dispatch with at least an engine and a squad, that was no different and we were initially dispatched for a car accident, so we definitely -- we normally dispatch with both apparatus on that type of call.

Q. And again, if I missed this, I apologize, but how many people responded with you to the call?



HANSON RENAISSANCE COURT REPORTERS & VIDEO hansonreporting.com 313-567-8100

Page 10

A. So there would have been the captain, the FEO or the driver, Rick Breen who was our rookie and then myself and James Muirhead, so five I believe.
Q. Okay. Good. And the information that you had that brought you to the scene was there was a motor vehicle accident?
A. Correct.
Q. Any other information at all that you can recall?
A. Dispatch told us there was a vehicle that ran into a building. That's what I believe the dispatch information contained.
Q. And then you guys got to the scene I take it, correct?
A. Uh-huh.
Q. Yes or no? I'm sorry.
A. Correct.
Q. Okay. Good. And when you got to the scene, what did you see?
A. Well, when we got on scene, we saw a vehicle that had hit the corner of a trailer. We saw the police officers. I remember seeing Officer McKibben, I don't remember seeing his partner, but I remember seeing the patient walking across the street away from where the vehicle was.
Q. Okay. And other than Officer McKibben, are there any other officers at the scene that you saw?

Page 11

A. I might have at the time. I don't recall seeing where they were at. I just remember seeing Shane.
Q. Are you familiar with former City of Warren police officer Sergeant Gill?
A. Not personally, no.
Q. Okay. Other than Shane McKibben, do you know -- at the time, did you know Kevin Barnhill?
A. No.
Q. Robert Roy?
A. No.
Q. John Adams?
A. No.
Q. Dale Van Horn?
A. No.
Q. But you knew Shane McKibben?
A. Well, at the time, I had went on a few calls with him. I wouldn't say I knew him. I've gotten to know him a little bit better since then, but that's about it.
Q. You would know him by name?
A. Just from seeing him at work, yeah.
Q. Then you see Officer McKibben and you see Mr. Pellow, you didn't know him as Mr. Pellow at the time, but Mr. Pellow walking away from the scene, correct?
A. Yes.
Q. Then what did you do?

Page 12

A. We parked. We got out of the vehicles. Officer McKibben asked us in assistance to control the patient. So we started walking toward him. He went up on a trailer or the deck to a trailer that wasn't his and from that point, we told him, "Hey, come over and talk to us," because we had to start assessing the patient, see if he was injured, anything to that effect.
As we go to go into -- he tries to go into the building. I told him, "Hey, man, you can't do that." He turned around and struck me in the face. Then we ended up several of us trying to control the patient for his safety and for ours obviously.
It took several minutes. There was at least five or six of us attempting to restrain him and he put up an impressive fight doing so. Eventually, we got him handcuffed. Once we did finally get him handcuffed, he acutely became unresponsive I guess you'd say. He went from fighting extremely hard to pretty much nothing at all.
So we rolled him over immediately, found out that -- we assessed him real quick, found out he was at best giving agonal respirations which is basically just saying that he was not breathing adequately I guess you'd say. I assessed his pulse. He didn't have one. So we immediately moved him to the cot and started CPR.

Page 13

Q. How often do firefighters assist police officers with effectuating an arrest or getting control of a citizen?
A. It's not often, but it's not unheard of either especially if it's a situation where the safety of ourselves or the police officers is in question. Then we'll obviously back each other up in that type of situation.
Q. And you said there were four or five of you who were subduing Pellow?
A. I believe so. It's hard to keep track of exactly who was there, but --
Q. Was McKibben one of those people?
A. I believe so, yeah.
Q. Was there another officer that was assisting?
A. I believe so, but I couldn't tell you for sure.
Q. Who among the firefighters was physically assisting subduing Mr. Pellow?
A. Myself, Curtis Thrift, James Muirhead and I think Rick Breen was there, but honestly, I can't recall seeing him doing it.
Q. I understand that Mr. Pellow struck you in the face, correct?
A. Correct.
Q. Were you knocked out at all? Did you lose any consciousness, anything like that?



HANSON RENAISSANCE COURT REPORTERS & VIDEO hansonreporting.com 313-567-8100

A. No.
Q. Okay. Good. And when you subdued or attempted to subdue Mr. Pellow, were the officers and you trying to get handcuffs on him?
A. Correct.
Q. Okay. And were those handcuffs ankle cuffs or both?
A. I believe both, but honestly, I can't -- it's hard to recall.
Q. Are you certain about the handcuffs?
A. Absolutely.
Q. And the ankle cuffs?
A. I'm pretty sure we did because I know we had a hard time getting his legs under control and the only way to restrain somebody who's kicking you in the legs is to put cuffs on their feet as well.
Q. Do you recall how long that took?
A. I mean it felt like it was at least five minutes. It's hard to tell when you're in that type of high stress situation, but it felt like it was at least -- it was an excessively long amount of time with five people fighting with one person. I'll say that.
Q. From the time that you first attempted to help the police subdue Mr. Pellow to the time where you turned him over and he was unresponsive, did you ever walk away from that scene?



A. Negative.
Q. Now, Mr. Pellow, as I understand it, was face down when the handcuffs and maybe the ankle cuffs were affixed; is that correct?
A. That sounds about right, yeah.
Q. When he was unresponsive, what did you guys do then?
A. Well, when he became unresponsive, we immediately flipped him over. This is right after we restrained the patient. We flipped him over. I could tell his respirations weren't what they normally would be. I assessed his carotid pulse or the one on his neck. He didn't have one, so we immediately moved him to the cot and started CPR.
Q. When you moved him to the cot, did anybody remove his handcuffs or his ankle cuffs?
A. Negative.
Q. And was he responsive on the cot at all?
A. No.
Q. When he ended up, when he was not responsive on the cot, what happened next? Was there another EMS unit called or was he transported someplace?
A. What happens was we put him on the cot, we buckle him in, obviously we don't want him to fall off the cot, started CPR immediately, put him in the back of the ambulance. That's the reason we have both apparatus go



to the call. We have paramedics on both the engine and the ambulance. So we took the extra personnel onto the ambulance with us and we started ACLS protocol, typical protocol for any CPR type of event, followed that protocol, transported him to the closest hospital which was St. John Oakland on Dequindre and during the treatment process, we weren't able to get any viable changes in his condition.
Q. Okay. And is he transported to the hospital, wherever he ends up going, on the same cot you placed him on?
A. Correct.
Q. And when he was handcuffed, was he handcuffed in front or in back?
A. I believe in back, but you know, it's hard to recall.
Q. Do you recall at any time anybody un-cuffing him, either his hands or his ankles?
A. I don't recall it, no.
Q. Okay. Did you ask anybody to un-cuff him?
A. Negative.
Q. Did you hear anybody suggest or ask that Mr. Pellow be un-cuffed?
A. Not that I recall.
Q. Now, at the time -- at the scene after this event occurs and Mr. Pellow is unresponsive, what do you do? Do you go back to your rig, go back to the department?



What happens?
A. Ask that again.
Q. After Mr. Pellow is placed on the cot and he's unresponsive, is there a time, let's put it this way, that you go back to your truck?
A. Well, we do not relinquish care of the patient until we get them to the hospital. So once he's in the ambulance, we're providing care, we transport him to the hospital. We transfer him to the hospital bed. We give the report to the doctors and the nurses and then once they accept patient care, then it's their responsibility for the patient. We reset our rig, replace everything that we've used and go back in service.
Q. Okay. And in this particular case, when you were at the hospital, are Mr. Pellow's hands and/or ankles still cuffed?
A. I believe so, but I honestly can't recall.
Q. When you were at the hospital, was any police officer there?
A. I'm sure they were, but I don't remember speaking with them or seeing them there.
Q. That's fine. At the time -- strike that.
After you leave the hospital, when is the next time anybody contacts you about Nathan Pellow?



HANSON RENAISSANCE COURT REPORTERS & VIDEO hansonreporting.com 313-567-8100

Page 18

A. Well, we went back to the station and because with the type of event and this is not an uncommon thing I guess depending on the type of situation, the captain thought it was wise for us all to write a report which is why we have the incident reports that we have other than the care report, but since then no one has contacted me other than in regards to showing up to this proceeding.
Q. Okay. So would that be you and the fellow firefighters on your crew who wrote reports as far as you know?
A. Correct.
Q. What other firefighters showed up at the scene if you know?
A. Well, the ones in my crew, so there was Curtis Thrift, Ted Garwood, Rick Breen, James Muirhead and myself.
Q. Any other firefighters that you know?
A. No.
Q. Okay. Was there any discussion at the station regarding exactly how Mr. Pellow died?
A. There might have been some -- what's the word I'm looking for -- speculation, but it's more in reference to what our protocols are than any specific diagnosis. That's kind of above our heads.
Q. And just so I understand it, have you reviewed any transcripts in this case at all?
A. Transcripts?

Page 19

Q. Any deposition transcripts?
A. Negative.
Q. Okay. Was there a time that an officer for the City of Warren approached any firefighters at their rigs to tell them to take a look at Pellow as far as you know?
A. Ask that again.
Q. Was there a time when an officer for the City of Warren, a police officer, came to you and perhaps your crew while you were at your rig and your truck and asked you to look at Pellow?
A. The only time that would have been possible was when we initially showed up on scene when Officer McKibben asked us for assistance. From that point on, we were in direct contact or care of the patient the rest of the time until his care was given over to the hospital.
Q. I got it. So what you're telling me is from the time of your initial contact with Pellow until the time you actually transported him to the hospital, you were with him the entire time?
A. Correct.
Q. There was never a time that you walked away?
A. Correct.
Q. And never a time you stepped back. You were always there?
A. Correct.

Page 20

Q. Do you know of any videotapes that captured or reflected your interaction with Mr. Pellow?
A. The police might have something, but there's nothing on our regard that we keep video-wise, so nothing I'm aware of.
Q. And I take it that you don't -- are you mic'd up at all?
A. Negative.
Q. I'm going to show you a couple things. This is marked as Exhibit 1 at Sergeant Gill's deposition. Do you recognize this?
A. I believe this is the back door of the trailer he was attempting to go through.
Q. Okay. Good. And --
MS. DRUZINSKI: I'm sorry. You said that was Exhibit 1 of Gill?
MR. SKLAR: Yes.
MS. DRUZINSKI: Okay. Thank you.
BY MR. SKLAR:
Q. And is that where he was actually -- strike that.
Does Exhibit 1 reflect the area where you attempted to subdue, with the police officers, Mr. Pellow?
A. Yes, in the extent that he was attempting to go through that door. I was the first person to make contact with

Page 21

him at the door and told him to come over so we could talk to him, something to that effect, I can't remember the exact words to be honest with you, tried to keep him from going through the door because it wasn't his trailer. That's when he turned around and hit me. When he hit me, we attempted to restrain him and because there was no rail on it, we fell off to the side to the right there.
Q. All of you together, you all fell? Did you fall, Mr. Pellow fall --
A. It was at least me and Mr. Pellow. I couldn't tell you who else was involved because it was obviously a pretty hectic scene, but it was more than myself and him, yeah. We were trying to restrain him.
Q. Sergeant Gill testified that he saw McKibben stand and bounce on Mr. Pellow's body. Did you ever see such a thing?
A. No, and it wouldn't have been possible.
Q. Why not?
A. Whenever we went over the edge -- obviously, I was the first one to make contact with him. When me and the other firefighters who were initially making contact with him fell off the side of the porch there, I remember basically trying to restrain his shoulders. So Shane would have had to have been jumping on me in



HANSON RENAISSANCE COURT REPORTERS & VIDEO hansonreporting.com 313-567-8100

Page 22

order to be jumping on the patient.

Q. But Sergeant Gill's testimony is a little bit different than that as far as the time sequence. It differs with yours. Your time sequence is that you were with Mr. Pellow from the initial contact when you tried to help the officers all the way until you took him to the hospital, correct?

A. Correct.

Q. With no break in between?

A. Absolutely.

Q. So your and Sergeant Gill's testimony differs in that respect. How long was your -- I know you said it took about five minutes to subdue Mr. Pellow.

A. Is seemed like it. It's hard to say exactly.

Q. How long did it take to provide him care afterwards?

A. I mean from the point that we noticed he was unresponsive to the point we handed him over to the hospital's care. Time frame-wise if I had to guess, five, 10 minutes, but it's purely speculation. So from the point we found out he was unresponsive, once we got him restrained through to the point we handed him over to the care of the hospital, whatever that time frame would have been.

Q. So at the time that you tried -- was there a time you tried to resuscitate Mr. Pellow?

Page 23

A. Absolutely. Once we turned him over and realized he was unresponsive and didn't have a pulse, the rest of the time we were with him was attempting to resuscitate him.

Q. And when you attempted to resuscitate him, did you use any -- I don't know what you guys did -- any shock, anything at all? What did you try to do?

A. Our protocol -- because initially once you find a patient who doesn't have a pulse, you start CPR. We started CPR and moved him into the rig and continued with ACLS protocol. I believe through the PCR, it's been a lot of calls since then, I believe we found him to be in asystole which is basically we do put him on a cardiac monitor. I have to believe that's what you're leaning toward. We assess what his heart condition is, his overall health condition. He didn't have a pulse, so we maintained CPR. He wasn't breathing, maybe agonally at best which as I said earlier was just ineffective.

So we intubated the patient, put a tube down his throat so we could breathe for him, gave him some medications to attempt to revive him, I know Narcan, which is a medication that reverses opioid drugs, and epinephrine which is a medication for any patient in cardiac arrest. But we followed those ACLS protocols

Page 24

which included CPR, monitoring his condition of his heart, whatever treatments might be necessary and we followed those protocols until we got him to the hospital.

Q. Okay. I'm going to show you what's been marked Exhibit 2 of Mr. Gill's or Sergeant Gill's deposition and it's the police report. Have you ever seen that document? You can go through it.

A. No, I've never seen this.

Q. Okay. Sergeant Gill alleged that there's a report that he wrote -- he's alleged to have written that he never wrote at all and never submitted. Did anybody have any influence in your report at all?

A. No.

Q. So you have a, from what I can tell, a Warren Fire Department PCR run report?

A. Correct.

Q. And what is the purpose of generating that report?

A. Multiple things. We document it for health care reasons. A lot of that information is maintained on a statewide and federal level to keep track of what does and doesn't work medically speaking, keep them for legal proceedings such as this one obviously. We keep track of run numbers for multiple purposes, but those are the main ones I'd say.

Page 25

Q. And is the purpose to try to be as complete as you can with information that's relevant with what you're trying to do?

A. Absolutely.

Q. Okay. In your report, you write that there were shackles -- I'll show it to you. Do you have the report, your report, this one? You can take a look at mine if you want to. I just want to go through it real quick.

A. Go ahead.

Q. I'm looking at your narrative and it says PFF -- I'm starting right from I think the third sentence, fourth sentence. "However, was then forced to the ground and was restrained with PD shackles," that's police department shackles, correct?

A. Yes.

Q. Does that help refresh your recollection that both the feet and ankles were shackled?

A. Like I said, it's hard to remember exactly, but I'm fairly certain that both feet and hands were cuffed.

Q. Okay. And again, you don't recall anybody un-cuffing Mr. Pellow at all?

A. Not that I recall, but frankly, it probably would have gotten in the way because every second we wait for someone to un-cuff the patient, the less we are able to



HANSON RENAISSANCE COURT REPORTERS & VIDEO hansonreporting.com 313-567-8100

Page 26

do for him medically speaking.
Q. So as far as you understand it, it would have been proper protocol to leave him as he is, the handcuffs, the ankle cuffs on?
A. As long as it's not interfering with medical treatment.
Q. And if the ankles were shackled, that wouldn't be interfering with medical treatment, would it?
A. No.
Q. And as far as you understand it, Mr. Pellow was shackled all the way to the hospital?
A. I believe so, but it's hard to recall.
Q. But that's your best recollection?
A. I think so.
Q. Okay. And you also -- I'm looking at your written statement. I'm not going to mark it as an exhibit, but again, do you have your written statement with you? I just want to go through it real quick. Again, this witness statement was generated at the police department or the fire department or does it matter?
A. We wrote these reports back at our fire station.
Q. And who gave you this? I mean when it was blank I take it is when you filled it out, correct?
A. Correct.
Q. And who gave it to you?
A. My captain.

Page 27

Q. And what were his instructions, if any?
A. Just write down what happened.
Q. Okay. Good. And if you can tell me -- I don't see a date and there may be one on here, so I apologize. When did you fill this out if you know?
A. Once we got back from the run that day.
Q. All right. Good. And your signature is on the bottom, correct?
A. Correct.
Q. Tell me because I'm not familiar with the City of Warren, where is the police department and fire department? Are they situated close by?
A. We have six different stations for the fire department. My station at the time was at Nine and Ryan. Obviously the police station is right behind where we're at right now.
Q. All right. And at this time, you hadn't been on the fire department or you were a probationary employee at the time, correct?
A. Correct.
Q. And you had been on the department for a few months at that time?
A. Something to that effect.
Q. Do you know when your start date was?
A. May 15th.

Page 28

Q. So it would have been around -- my math is awful -- around three months, something like that?
A. Right.
MR. SKLAR: Just let me step outside and we may be done.
THE WITNESS: Okay.
(Short recess.)
BY MR. SKLAR:
Q. Is it firefighters? What do they call you, I mean officially?
A. Well, you can call me Brian, but my title would be Firefighter Jacobs.
MR. SKLAR: Well, Brian, I have no more questions for you.
THE WITNESS: All right.
MS. DRUZINSKI: I've got just a few.
First off, housekeeping, did you want to mark these as exhibits?
MR. SKLAR: Sure. If you could mark them just as 1 and 2.
Can I just do the foundation real quick for them?
MS. DRUZINSKI: Sure.
BY MR. SKLAR:
Q. Officer, we're going to mark your witness statement as

Page 29

Exhibit 1 and your PCR as Exhibit 2 and just for the record, those are your documents that you generated, correct?
A. Yes.
Q. And on the date of the incident, 8-30-2013?
A. Correct.
Q. Okay. And there's no question that those are your documents, that they are authentic?
A. Correct.
MR. SKLAR: Okay. That's it.
EXAMINATION BY MS. DRUZINSKI:
Q. Okay. Firefighter Jacobs, I have just a few questions for you. Thank you for your time. At any time while you were on the scene of this incident, did you ever witness any Warren police officer strike Mr. Pellow with a flashlight?
A. Negative.
Q. At any time while you were on the scene, did you witness any Warren police officer stand on Mr. Pellow's back and bounce?
A. Negative.
Q. Now, I know Counsel asked you a similar question, if you saw Shane McKibben do so, and you replied that it was not possible, and it's because your time frame or your time reference of this incident varies a little



HANSON RENAISSANCE COURT REPORTERS & VIDEO hansonreporting.com 313-567-8100

bit from Mr. Gill's testimony. I'd like to explore that a little bit with you.

You said that it would not be possible because Shane would have essentially been standing on you because of your position in relation to Mr. Pellow. At any time after Mr. Pellow was handcuffed, did you see Shane or any other officer standing on Mr. Pellow's back?

A. Negative.

Q. At any time after Mr. Pellow was handcuffed, did you ever walk away from Mr. Pellow? Did you ever walk back to either your ambulance or to the fire truck?

A. No. Once we made patient contact, we were in direct contact with him basically until we gave care over to the hospital.

Q. So if Officer McKibben was standing on the back of Mr. Pellow, you would have seen it because he would have been standing right in front of you, correct?

A. Absolutely.

Q. And you did not see him do such a thing?

A. Correct.

Q. And how soon after Mr. Pellow was handcuffed did you notice that he was in distress?

A. It was almost immediately. It was basically it might have been the reason we were able to get him restrained



because we were having an extremely difficult time restraining the patient. Once we did get him handcuffed or restrained, we noticed he basically became less responsive, flipped him over and found out he was basically in cardiac and respiratory distress.

Q. And lastly, during the time that you were on the scene, did you hear any of the officers giving verbal commands to Mr. Pellow to either stop resisting, stop running, get on the ground, things of that nature?

A. I believe it was pretty much consistent throughout the entire time we were attempting to restrain him.

Q. And did you observe Mr. Pellow disobeying those commands?

A. He was completely disregarding it.

MS. DRUZINSKI: Okay. Thank you very much, Firefighter. I appreciate your time.

RE-EXAMINATION BY MR. SKLAR:

Q. I just have a couple follow-ups. I understand initially that you and Mr. Pellow, whoever else was with you, fell off the stoop from what I can tell in Exhibit 1, correct?

A. Correct.

Q. And that's when you were on top of Mr. Pellow because you fell on top of him?

A. We fell together. I don't know if I landed on top of



him or who landed on who, but we fell down.

Q. But there came a time where the bodies separated?

A. I'd say no, I mean because when he struck me, I was the first response. With any type of patient who's being combative, there's an attempt to restrain him. So if we were to separate at that point, it would just give him more of an opportunity to attack me or my partners. So when we fell to the ground, we were pretty much in direct contact the entire time.

Q. I got it. But you were on top of him?

A. No.

Q. And when the handcuffs and ankle cuffs or shackles were affixed, were you all still on top of him or --

A. We were attempting to restrain his limbs, but no one was literally on top of him.

Q. And again, when his limbs were finally shackled and he was finally restrained, at that point, did he relax?

A. It might have been because he relaxed that we were able to shackle him. Honestly, it's hard to assess in that type of situation. But once we did notice that he was or once we got him shackled, we were able to flip him over and evaluate him. That's when he was noticed to be unresponsive.

Q. And again, when he was shackled, you weren't covering his back? Nobody was covering his back?



A. No.

Q. Okay. Good. And from the time that he was shackled to the time -- on both the hands and the ankles and he was turned over, how much time elapsed? Was it seconds? A minute?

A. Ask that again, sir.

Q. From the time that Mr. Pellow had relaxed, the shackles were affixed, correct?

A. Right.

Q. From that time, that period where he relaxes, shackles are affixed, how long before he was turned over on his back?

A. Seconds, as long as it took to actually flip him over.

Q. Okay. Good. And at that time, did you notice if his complexion was purple? White? Did it change?

A. He was red from the struggle, but honestly, I couldn't tell you exactly what the rest -- we just could tell that he wasn't being responsive and followed up on our assessment.

Q. I take it you were winded, too?

A. Yeah.

Q. It was a struggle and --

A. Correct.

Q. And you mentioned that you were on probation. Is there another department you had worked for before this?



HANSON RENAISSANCE COURT REPORTERS & VIDEO hansonreporting.com 313-567-8100

A. A couple actually. Before I worked for Warren, I worked part time for the City of Novi for three or four years as a firefighter, before that as a paid on-call firefighter for the Township of Milan and I also worked in private EMS for six, seven years, something to that effect I believe.
Q. Had you been involved in a situation like this before?
A. Not to this exact extent, but I have had to help restrain patients in the past.
Q. Have you ever been in a situation where you helped restrain patients in the past and the patient died?
A. Negative.
Q. And at the time that you realized that there was something, I mean there came a time you realized there was something wrong with Mr. Pellow, physiologically, he wasn't responding, correct?
A. Correct.
Q. Did your adrenaline get high or did you get nervous, did you get scared, anything at all?
A. No, I wouldn't say so. Obviously, we had been working rather hard to restrain the patient, so our heart rate was up strictly because of the exercise, but I mean the situation of finding a patient unresponsive and in cardiac arrest by this point is not new to me, so it's something we are capable of handling.



Q. But in this setting, you'd never been in this situation before because you and the police were trying to subdue a citizen and that citizen ended up dying when you were there, have you?
A. I've not been in a situation where the patient ended up dying that we were attempting to restrain, no, but I don't feel that overly affected my ability to stay calm during the treatment of the patient if that's what you're asking.
Q. Because you guys are all professionals?
A. We try to be.
Q. And the same is true of the police officers and we expect all you guys to exercise -- be professionals, fair enough?
A. Yes, sir.
Q. Okay. Good. If I asked this, I apologize. Did you ever speak to Arthur Gill about this incident?
A. I don't believe I've ever spoken with him.
Q. Ever speak to any reporters about this event?
A. No.
Q. Before this deposition, have you met -- I don't want to know what you said -- did you meet with lawyers before this?
A. Negative.
Q. Just today?



A. I mean I spoke with her over the phone the other day.
Q. Okay. I don't care what you guys said. And how long did you speak for, just the time period?
A. Probably 20 minutes.
Q. And did you meet today, this morning before the deposition?
A. Just while we were waiting for everyone else to arrive.
Q. That's good. How long was that?
A. 10 minutes, five minutes.
Q. Did you ever speak with a Mr. Listman or any other lawyer about this event?
A. I don't believe so, no.
Q. And as I understand it, just so I'm super clear, nobody from the City of Warren Police Department or anyplace else or any other department has contacted you to ask you questions about Nathan Pellow?
A. No.

MR. SKLAR: Okay. Good. All right. Thank you. That's it.

MS. DRUZINSKI: You're all set.

DEPOSITION EXHIBITS 1 AND 2
WERE MARKED BY THE REPORTER
FOR IDENTIFICATION.



(The deposition was concluded at 10:41 a.m.; signature of the witness was not requested by counsel for the respective parties hereto.)





CERTIFICATE OF NOTARY

STATE OF MICHIGAN )
) SS
COUNTY OF MACOMB )

I, Gail R. McLeod, Certified Shorthand Reporter, a Notary Public in and for the above county and state, do hereby certify that the above deposition was taken before me at the time and place hereinbefore set forth; that the witness was by me first duly sworn to testify to the truth, and nothing but the truth, that the foregoing questions asked and answers made by the witness were duly recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to either party nor interested in the event of this cause.

Gail R. McLeod, CSR 2901
Notary Public,
Macomb County, Michigan

My Commission expires: September 23, 2017



HANSON RENAISSANCE COURT REPORTERS & VIDEO hansonreporting.com 313-567-8100