# EXHIBIT J

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


JENNIFER PELLOW as Personal

Representative of the Estate

of NATHAN WESLEY PELLOW,

        Plaintiff,

-vs-                                    Case No. 15-11765

KEVIN BARNHILL, SHANE McKIBBEN,   Hon. Terrance G. Berg

ARTHUR L. GILL, ROBERT ROY,

JOHN ADAMS, and DALE VAN HORN,

Jointly and Severally,

        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~/

DEPONENT:      ARTHUR LESLIE GILL

DATE:          Tuesday, May 10, 2016

TIME:          2:49 p.m.

LOCATION:      Davis, Burket, Savage, Listman, Taylor

               10 S. Main Street, Suite 401

               Mt. Clemens, Michigan

REPORTER:      John J. Slatin, RPR, CSR-5180

               Certified Shorthand Reporter


(Appearances listed on page 2)

Page 2

1  APPEARANCES:
2
3     JOEL B. SKLAR (P38338)
4     Law Offices of Joel B. Sklar
5     615 Griswold Street, Suite 1116
6     Detroit, Michigan 48226
7     (313) 963-4529
8     joel@joelbsklarlaw.com
9        Appearing on behalf of the Plaintiff.
10
11    JULIE L. DRUZINSKI (P72105)
12    Garan Lucow Miller, P.C.
13    1155 Brewery Park Boulevard, Suite 200
14    Detroit, Michigan 48207
15    (313) 446-5501
16    jdruzinski@garanlucow.com
17       Appearing on behalf of the Defendants
18       Barnhill, McKibben, Roy, Adams and VanHorn.
19
20       (Appearances continued on page 3)
21
22
23
24
25

Page 3

1  APPEARANCES CONTINUED:
2
3     WILLIAM N. LISTMAN (P52030)
4     Davis, Burket, Savage, Listman, Taylor
5     10 S. Main Street, Suite 401
6     Mt. Clemens, Michigan 48043
7     (586) 469-4300
8     wlistman@davislistman.com
9        Appearing on behalf of the Defendant Gill.
10
11    ALSO PRESENT: Jennifer Pellow
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1  TABLE OF CONTENTS
2
3  WITNESS                                      PAGE
4
5  ARTHUR LESLIE GILL
6
7     Examination by Mr. Sklar            5
8     Examination by Ms. Druzinski       39
9     Examination by Mr. Listman         59
10    Re-Examination by Mr. Sklar        60
11    Re-Examination by Ms. Druzinski    62
12
13 EXHIBITS (Attached):                  IDENTIFIED
14
15    Exhibit 1   Photograph                  5
16    Exhibit 2   Warren Police Department,   5
17                Case Report, CR No.
18                130052560
19
20
21
22
23
24
25

Page 5

1                  Tuesday, May 10, 2016
2                  Mt. Clemens, Michigan
3                  2:49 p.m.
4                       * * *
5          (Deposition Exhibits 1 and
6           2 marked for identification.)
7                       * * *
8          MR. SKLAR: Let the record reflect that this is the
9   discovery deposition of Arthur Gill, taken pursuant to
10  Notice, to be used for all purposes allowed by the
11  Federal Court Rules and Federal Rules of Evidence.
12                      * * *
13         ARTHUR LESLIE GILL,
14  having been first duly sworn, was examined and testified
15  as follows:
16               EXAMINATION
17  BY MR. SKLAR:
18  Q. Is it Sergeant Gill?
19  A. It's Art Gill.
20  Q. Art Gill. Forgive me. I apologize.
21  A. No, that's okay.
22  Q. Mr. Gill, have you ever given had your deposition taken
23     before?
24  A. Yes, sir.
25  Q. Okay. I'm going to go through the ground rules, and

Page 6

1 then I'll kind of get into your previous depositions;
2 okay?
3 A. Okay.
4 Q. Really what a deposition is, at least the way I see it,
5 is just to try to find out what a witness knows or
6 doesn't know. If there's a question I ask you that
7 isn't clear, that doesn't make sense, you simply can't
8 answer in the form that I ask it, just tell me, and I'll
9 do my best to rephrase it. If you don't know an answer,
10 just tell me you don't know. If you don't recall,
11 that's perfectly fair. Just tell me you don't recall.
12 A. Okay.
13 Q. Let me get the question out before you give a response
14 so the court reporter can get everything down. And if
15 at any time you need a break, just tell me.
16 A. Okay.
17 Q. And you're entitled to that.
18    In what cases -- how many times have you been
19 deposed?
20 A. This is just an estimate. I've been an officer for a
21 long time.
22    Twenty to 25.
23 Q. Okay. And were some of those excessive force cases or
24 allegations of excessive force?
25 A. Not against me but other officers.

Page 7

1 I don't recall. They've been a variety of
2 different things over a long period of time.
3 Q. Okay. All right. So, this is the first time you've
4 been named as a party?
5 A. No, I've been named as a party before.
6 Q. Okay. So, let me understand.
7    When you've been named as a party before, it's
8 simply because you were present at the scene?
9 A. Correct.
10 Q. Okay. The -- you mentioned you had been a police
11 officer for a long time?
12 A. Yes, sir.
13 Q. How long?
14 A. Well, the City of Warren, 16 years.
15 Q. Okay.
16 A. The University of Detroit Mercy, I was in grad school.
17 While there, I was an officer there. I spent some time
18 in Royal Oak Township, and then in the Marine Corps back
19 in the mid-eighties.
20 Q. Okay. And let's just go with the City of Warren.
21    You started, I take it, as just a patrol officer?
22 A. Yes, sir.
23 Q. All right. And did you -- can you go through your
24 promotions with me?
25 A. Sure.

Page 8

1 Q. Go ahead.
2 A. I was hired in '98.
3 Q. Yep.
4 A. I was promoted to corporal, detective, back in
5 approximately 2008 or '09.
6    And I was promoted to sergeant approximately 2011,
7 I believe it was.
8 Q. Okay. And this is an idiotic question but I'll ask it
9 anyway.
10    On August 30, 2013, you were employed by the City
11 of Warren?
12 A. Yes, sir.
13 Q. And you were employed as a police officer, a sergeant,
14 specifically, in the police force?
15 A. Yes, sir.
16 Q. Okay. Good.
17    And there came a time that you received a copy of
18 this Complaint; true?
19 A. Yes, sir.
20 Q. All right. When you received the Complaint -- when
21 everybody was served with the Complaint, did that in any
22 way impact your employment with the City of Warren?
23 A. I was terminated well prior to receiving the Complaint.
24 Q. Okay. And what were you -- what were you terminated
25 for?

Page 9

1    MR. LISTMAN: Your Honor --
2    MR. SKLAR: "Your Honor"? I wish.
3    MR. LISTMAN: I'm going to place an objection on
4 the record at this point. We're going to object to him
5 testifying to anything in that regard. I mean, the
6 Fifth Amendment --
7    MR. SKLAR: Okay.
8    MR. LISTMAN: -- 404, and 609. FRE 404 and FRE
9 609.
10    MR. SKLAR: I got it.
11 BY MR. SKLAR:
12 Q. I take it you're no longer working for the City of
13 Warren?
14 A. I am not.
15 Q. Okay. Just tell me when you stopped.
16 A. It was April 17th of '14.
17 Q. Okay. And let me ask you this question: Did anything
18 that relates to Nathan Pellow impact your employment at
19 the City of Warren?
20    MR. LISTMAN: Again, we've got an objection on the
21 record regarding that type of testimony.
22    MR. SKLAR: Okay.
23 BY MR. SKLAR:
24 Q. Let me ask you this question: With Mr. Pellow, did
25 you -- did you report the incident to the City of

Page 10

1    Warren?
2    A. Yes, I did.
3    Q. Okay. How did you do so?
4    A. At the scene, I briefed Captain Matheney on what took
5       place, and he didn't seem to think that what I told him
6       was accurate and we would have a debriefing at a later
7       time.
8    Q. What did you tell Captain Matheney?
9    A. That an Officer McKibben had stood on Mr. Pellow's back
10      and jumped up and down while he was handcuffed.
11   Q. Okay. And is this something you witnessed?
12   A. Yes, sir.
13   Q. And was -- did this precipitate his death? Mr. Pellow?
14   A. I don't know.
15   Q. Okay. What did Captain Matheney -- you said he -- what
16      did -- I know -- say it again.
17         What did Captain Matheney tell you?
18   A. I briefed Captain Matheney on the entire situation of
19      the information that I had at that time, including
20      Mr. -- or Officer McKibben's actions. Mr. -- Captain
21      Matheney said basically that didn't happen, and we'll
22      have a debriefing when we get back to the station.
23   Q. Okay. And then what did you do in regards to the Pellow
24      matter?
25   A. Well, I called the detective bureau, evidence

Page 11

1    technicians to document all the scene, and we never had
2    the debriefing, despite the fact of my repeated requests
3    to Captain Matheney for that debriefing.
4    Q. Okay. What information -- tell me this: Other than --
5       what was the officer who jumped on the back?
6    A. Shane McKibben.
7    Q. McKibben.
8       What -- let's just start -- let me start from the
9       beginning and we'll get there; okay?
10   A. Sure.
11   Q. On August 30th, 2013, how did you first become aware of
12      the incident involving Mr. Pellow?
13   A. It came over the air as an accident on Doncea, which is
14      a trailer park area in the Ten and Ryan location. The
15      officer arrived. Shortly after he arrived there, he
16      requested assistance. And McKibben was the second
17      officer responding.
18         Once McKibben got there, shortly thereafter one of
19      the officers -- I don't know which one -- said over the
20      air, "Send additional officers."
21         And Dispatch attempted to find another officer. I
22      knew we were busy that day, and they could not. I was
23      on the road at the time. I was a ways away, around
24      8 and a half and Van Dyke area. I advised Dispatch that
25      I would be headed that way, but I was a ways off.

Page 12

1    I arrived on scene, and once I arrived on scene, on
2    the way there, they said they had moved from the Doncea
3    location to a street next to him called Nuway. So, I
4    entered Nuway, saw the fire truck, passed the fire
5    truck, and one of the officers said that -- "Hey, Sarg,
6    you passed us up," because I couldn't see where they
7    were.
8       I backed up and saw them. They were to my left,
9    which was the west side of Nuway.
10   Q. Okay. How many officers did you see when you showed up?
11   A. Two officers and four to five firemen.
12   Q. Who were the two officers?
13   A. Shane McKibben and Kevin Barnhill.
14   Q. Okay. Did they come -- do you know if they came in one
15      squad car or two?
16   A. Each one was in a one scout car assignment.
17   Q. Okay. And tell me what you did next.
18   A. Well, I stopped the car. I exited and went to the
19      location where they were. They were by a trailer park
20      by some steps. Mr. Pellow was down on the ground. The
21      officers and firemen were on top of Mr. Pellow trying to
22      get him in custody.
23   Q. Okay. And when Mr. Pellow was on the ground -- I'm
24      going to show you a photograph. Tell me if this
25      refreshes your recollection of where he was.

Page 13

1    A. Sure.
2    Q. I had an exhibit marked 1. This is during discovery.
3       It's a photograph.
4    A. It would be in this area right -- approximately right
5       here.
6    Q. Okay. Great. So, you're pointing to the grass area to
7       the right of the steps?
8    A. Yes, sir.
9    Q. Okay.
10      MS. DRUZINSKI: If I may interrupt real quick?
11      What's the Bates number on the bottom of that?
12      MR. LISTMAN: It's 000946.
13      MS. DRUZINSKI: Thank you.
14      MR. SKLAR: Okay.
15      MR. LISTMAN: Do you know what? Can I -- how about
16      if I make a copy of this?
17      MR. SKLAR: Okay.
18      (Short recess at 2:57 p.m.)
19             * * *
20      (Record resumed at 2:58 p.m.)
21   BY MR. SKLAR:
22   Q. Mr. Gill, I'm showing you Exhibit 1, and -- here you go.
23      I'll look at the copy. You can look at the original.
24   A. Sure.
25   Q. And you had noted that you had seen Nathan Pellow.

Page 14

1  Q. Was he face down?
2  A. Yes, sir.
3  Q. Okay. And Nathan Pellow was face down on the grass area
4     to the right of these red stairs; correct?
5  A. That is correct.
6  Q. And what officers did you see?
7  A. Officer McKibben, Officer Barnhill, and approximately
8     four to five firemen.
9  Q. Okay. And tell me, what happened next? What do you see
10    next?
11 A. Well, I am running from this -- this is Nuway Street. I
12    approach. They're on top of Mr. Pellow, who is face
13    down. They're trying to get him handcuffed.
14 Q. Okay.
15 A. Shortly after I arrive, just within a few seconds, 30
16    seconds possibly, they finally got his hands cuffed and
17    he was under control.
18 Q. Okay. And is he still face down?
19 A. Yes, sir.
20 Q. Are his hands cuffed only, or are his hands and ankles
21    cuffed?
22 A. I only recall his hands being cuffed.
23 Q. Okay. Then what happens?
24 A. Everyone started getting off of Mr. Pellow. The firemen
25    had started walking to their rig. I recall one of them

Page 15

1     said they had gotten bit. Officer Barnhill said he had
2     suffered a shoulder injury, and everyone had just
3     started walking away from Mr. Pellow outside of
4     Mr. -- Officer McKibben.
5  Q. At that time, as far as you could see, was Nathan Pellow
6     alive?
7  A. Yes, he was.
8  Q. Was he breathing?
9  A. Yes, he was.
10 Q. Did he say anything?
11 A. No.
12 Q. Okay. And how do you know he was alive?
13 A. Well, I looked at him. He was moving a little bit, and
14    he was -- he was breathing.
15 Q. Okay. Then what did you see?
16 A. There was a white female that approached me. I don't
17    know who it was. We never did engage in any
18    conversation because as soon as she approached me, she
19    looked over my shoulder. I naturally responded, looked
20    over my right shoulder and saw McKibben standing on
21    Mr. Pellow's back.
22 Q. Okay. For how long did you see McKibben stand on
23    Mr. Pellow's back?
24 A. It was only a second or two, because as soon as I saw
25    it, I ordered him to get off of Mr. Pellow.

Page 16

1  Q. Okay. Do you know how long Mr. McKibben had been
2     standing on Mr. Pellow's back?
3  A. No, I don't.
4  Q. Okay. Did you see him jump on the back?
5  A. It wasn't a jump. It was more of a bounce.
6  Q. Okay. And then what happened?
7  A. Well, I approached Mr. Pellow to just assess to see if
8     he was okay, and he had seemed like his face turned a
9     little -- his skin turned a little bit of a darker
10    color, and he was sort of gasping for air at that point.
11 Q. And then what happened?
12 A. I ran to the firemen who were -- their rig was at the
13    Nuway -- on the street, Nuway, in front of this trailer,
14    and I requested their assistance. I said, "Hey, this
15    guy needs some help."
16 Q. Then what happened?
17 A. They all ran over to Mr. Pellow, loaded him up and took
18    him away.
19 Q. Okay. Was he still cuffed at the time?
20 A. Yes, sir.
21 Q. All right. Did you speak to Mr. -- or Officer McKibben
22    about what he was doing?
23 A. Not at that time. I think we talked about it a little
24    bit later.
25 Q. And what did Officer McKibben tell you?

Page 17

1  A. I don't remember.
2  Q. Okay. When -- based on your experience as an officer,
3     is standing and bouncing on someone's back when they're
4     face down appropriate police procedure?
5  A. No, sir.
6  Q. Have you ever been trained to do that ever?
7  A. No, sir.
8  Q. Okay. And did that shock you?
9  A. I don't know if "shocking" would be the right word.
10    It certainly wasn't appropriate, so that's why I
11    ordered him off of Mr. Pellow.
12 Q. Okay. And when did you discover that Mr. Pellow had
13    died?
14 A. I had received a call from one of the officers because
15    two officers -- since Mr. Pellow was so combative with
16    officers, I recall that two-officer crew, VanHorn and
17    Adams, escorted or accompanied the fire department to
18    the hospital.
19 Q. Okay.
20 A. Shortly thereafter, I received a call from one of the
21    officers that Mr. Pellow had passed away.
22 Q. Okay. Just so I'm super clear on this, at the time that
23    you saw Officer McKibben stand and bounce on the back of
24    Mr. Pellow, Mr. Pellow was in handcuffs and subdued;
25    true?

Page 18

1  A. Yes, sir.
2  Q. Okay. And when you learned that -- strike that.
3     Did you talk to any other officers other than
4     McKibben about him standing on Mr. Pellow's back?
5  A. Captain Matheney.
6  Q. Okay. And is that when -- again -- and I apologize this
7     is repetitive, but just let me do it.
8  A. Sure.
9  Q. And how soon after, you know, you were at the trailer
10    depicted on Exhibit 1 did you talk to Captain Matheney?
11 A. He didn't show up right away. It was probably
12    20 minutes to a half hour.
13 Q. Okay. And then --
14 A. And that's just a guesstimation. I might be off a
15    little bit.
16 Q. And I'm taking it as that. I understand time is
17    difficult, quite frankly, to quantify so easily.
18    And when you told Captain -- exactly what did you
19    tell Captain Matheny as far as you can recall?
20 A. I told Captain Matheney what had happened; that there
21    was a vehicle accident; Mr. Pellow had fought with
22    officers; that it made its way to the Nuway location;
23    and officers requested firemen to assist, which is sort
24    of abnormal. Firemen pretty much have a hands-off on
25    any police-type matters. And whenever they have a

Page 19

1  combative individual, they call the police. So, they're
2  pretty much hands-off. I don't know if it's in their
3  policies, but they very rarely get involved in police
4  matters.
5  Q. Okay.
6  A. So, I told Matheney all of these things on top of
7     McKibben's actions, and Matheney basically told me, he
8     said, "That didn't happen, and we'll have a debriefing.
9     We'll talk about it later on when we get back to the
10    station."
11 Q. And was that the end of the conversation?
12 A. That was the end of the conversation with Mr. -- Captain
13    Matheney.
14 Q. At the time Captain Matheney said, "That didn't happen,"
15    what was your experience? I mean, were you shocked?
16    Surprised? Bewildered? What --
17 A. No. I figured we'd talk about it in the briefing, and
18    we'd communicate a little more closely then.
19 Q. Okay. And you mentioned the debriefing never occurred?
20 A. Not with me, no.
21 Q. Okay. Were -- tell me, what was the next time you had
22    any discussion or -- concerning Mr. Pellow with any of
23    your officers, anybody at the Warren --
24 A. Well, I approached Captain Matheney back at the station,
25    hours later, in regards to the debriefing, and he

Page 20

1  basically said, "Not today. I've got things to do," and
2  just brushed me off basically.
3  Q. Okay.
4  A. And then the next day I asked him the same thing, and
5     once again he brushed me off.
6  Q. Okay. And did that concern you?
7  A. Well, I know he's a busy man, but I mean this is a
8     serious incident, so I thought that maybe it would have
9     a little bit more urgency to it.
10 Q. Okay. And what did you do when Captain Matheney blew
11    you off?
12 A. Well, unfortunately, two weeks ago, when I met
13    Mr. Listman here, I was able to review all the police
14    reports, and I noticed that some of the officers said,
15    the first line in their report:
16          "As a condition of employment with the
17    Warren Police Department, I'm ordered to write
18    this report from Captain Matheney."
19    That sort of tells me that they had a debriefing of
20    some kind because more than -- there was about three,
21    four, five officers put that in their report.
22    That's typically what's written after a debriefing.
23 Q. Okay. And when you read the reports, did they appear to
24    be accurate?
25 A. For the most part, yes.

Page 21

1  Q. Okay. You had written a report as well?
2  A. I did not.
3  Q. You did not?
4  A. No, sir.
5  Q. Okay. Well, let me show you what's been marked as
6     Exhibit 2, and I'll try to get you to the page. Maybe
7     you can help me out.
8     Here is Exhibit 2, and if you go to -- I'll try to
9     get you there a little bit quicker.
10    I'm looking at page 19 of 29. And it's -- and tell
11    me if -- I'm kind of middle of the page. It says "CR
12    number," and it gives, you know, "130052580-009(sic)."
13    And then it says: "Written By: WRGILLA (00434), Date
14    8-31-2013, 11:29 a.m."
15    Am I reading that correctly?
16 A. Yes, sir.
17 Q. And it appears to indicate that this is your report.
18    Am I reading that correctly or incorrectly?
19 A. It appears it would be my report.
20 Q. Is it your report?
21 A. No, sir.
22 Q. Okay. Do you have any idea how this was created if it
23    wasn't your report?
24 A. It's not my report. I didn't do it. I mean, the
25    department has our user names and passwords, and I'm not

Page 22

1  assuming anything, but that's not my report.
2  Q. Okay. Did you write a report?
3  A. No, sir.
4  Q. Okay. Did anybody ask you to write a report?
5  A. No, sir.
6  Q. Typically, in this type of situation, would you write a
7     report?
8  A. I was waiting for the debriefing, and then I would have
9     written a report, yes.
10 Q. Okay. Let's go through that because I'm not familiar
11    with what happens at the City of Warren Police
12    Department.
13       When there's a -- in this case, would there be a
14    debriefing because there was a death or --
15 A. It's a serious incident. So, yes, there would be a
16    debriefing. All the officers would get together and the
17    captain would find out -- you know, get a holistic view
18    of what occurred, because each officer sees different
19    things, and when you have them all together, you can
20    sort of piece things together a little better.
21 Q. Okay. And I take it you've been in debriefings before?
22 A. Yes, sir.
23 Q. Okay. And in this situation, would all of the officers
24    who arrived at the scene be part of that debriefing?
25 A. Typically.

Page 23

1  Q. Okay. And were you called to be part of the debriefing?
2  A. No.
3  Q. Do you have any idea why not?
4  A. I do not.
5  Q. Okay. Did it surprise you, you weren't called to be
6     part of the debriefing?
7  A. Well, you know, as time goes on, I mean, other things --
8     I know the Pellow -- you know, a death is serious,
9     and -- but we have lots of deaths, unfortunately. And
10    as time goes on, I requested from Captain Matheney,
11    "When are we going to have this debriefing?" probably
12    five, six, seven times over a two-week period, and he
13    just kept -- you know, for lack of a better term --
14    blowing me off, and I just let it go. You sort of
15    forget about things and you move on to other things.
16    It's in your rearview mirror, and you just move on.
17 Q. Okay.
18 A. So -- and then I notice that this report was written on
19    the day after, which has got my attention when I saw it
20    from Attorney Listman the other day.
21 Q. So, you've just recently seen these reports?
22 A. About two weeks ago.
23 Q. Okay.
24 A. Not even two weeks ago.
25 Q. All right. And the date of 8-31-2013 that's attributed

Page 24

1  to you, why did that -- I know you didn't write the
2  report.
3     Why did the date surprise you?
4  A. Because I always write my reports on that day. There's
5     no reason to write a report the following day or the
6     following week. Evidence technicians, detectives,
7     people like that who have ongoing investigations or a
8     processing of evidence, might not write a report that
9     day. They might write it the next day or the next week.
10    But my involvement was so small that I would have
11    written it immediately.
12 Q. Okay. And had you written a report, would you have
13    included what you saw McKibben do?
14 A. Yes, sir.
15 Q. Okay. You tried to talk to Captain Matheney, you said,
16    six or seven times over the course of the next two
17    weeks; correct?
18 A. Yes.
19 Q. And specifically about the Nathan Pellow matter;
20    correct?
21 A. Correct.
22 Q. And perhaps writing a report so you can document what
23    you saw; right?
24 A. Correct.
25 Q. Okay. And did -- what did Captain Matheney say to you

Page 25

1  every time you saw him?
2  A. Well, it was just passing in the hall. I'm usually in
3     the watch commander's office where there is a glass and
4     there's a men's bathroom to the left when you're inside
5     looking out. And he just walks by. It's a locker room,
6     and we just have quick, brief comments. "Hey, are we
7     going to have that debriefing?"
8        And sometimes he would answer me. Sometimes he
9     would say "no," or "another time."
10       I can't recall exactly what he said.
11 Q. Okay. And did you speak to any other executive officer?
12 A. He's third in command in the whole department, so that's
13    high enough.
14 Q. Okay. Good.
15       Did you speak to any other officers concerning the
16    Nathan Pellow matter?
17 A. Well, Barnhill and McKibben had come to me a couple days
18    later, and they expressed that they were having
19    difficulty handling -- not handling, but difficulty with
20    the Pellow incident. And I suggested to Matheney at one
21    point that maybe they could benefit from some
22    counseling.
23       To my knowledge, they never did. I don't -- they
24    may have, but to my knowledge I don't know if they ever
25    sought any professional therapy or counseling.

Page 26

1  Q. Okay. Have you reviewed the written reports of Barnhill
2     and McKibben?
3  A. Yes.
4  Q. Are those accurate?
5  A. I read all the reports. And the packet I got was so
6     redundant, I would have to read them again. But they
7     appear to be mostly accurate.
8  Q. Other than -- did -- nowhere -- and I'll represent this
9     to you, and it's in the report -- do any of the written
10    reports indicate that McKibben was standing and bouncing
11    on Mr. Pellow's back?
12 A. No, sir.
13 Q. And because of that -- strike that.
14    An accurate and complete report would include that
15    fact; correct?
16 A. Yes, sir.
17 Q. Okay. And in your review of the documents and as I
18    represent it to you, the fact that it's not in the
19    report, what does that make you think of?
20 A. I don't want to speculate. I mean --
21 Q. I'm going to ask you to speculate.
22 A. -- they just didn't want that information to come out.
23 Q. Okay. Do you know if any of the -- if any other fire
24    department -- you know, firefighter or any other officer
25    altered any reports of any kind?

Page 27

1  A. Not to my knowledge.
2  Q. Have you heard anything about that at all?
3  A. No, sir.
4  Q. Okay. After the two weeks went by, did you ever make
5     any more inquiries about the Pellow matter?
6  A. Do you know what? I think -- after about two weeks and
7     five, six, seven requests, I think it just sort of faded
8     and we moved on.
9  Q. Okay. All right. Do you know if there was an
10    investigation concerning the Pellow death by the City of
11    Warren?
12 A. By the City of Warren, yes.
13 Q. Okay. And is the investigation what I have as Exhibit
14    2, or is there -- or do you think there's something
15    more?
16 A. Is this the whole report?
17    I mean, I've got a stack this big. So --
18 Q. Okay. This is what I have. I have some witness
19    statements, but nothing else like that.
20    MR. LISTMAN: If you know.
21 BY MR. SKLAR:
22 Q. If you know. If you don't, that's okay, too.
23 A. No, I don't.
24 Q. Okay.
25 A. I mean, it appears to be most of it. I would have to

Page 28

1     read it again, but --
2  Q. At the scene where Mr. Pellow was during this entire
3     incident when he's being -- whatever is happening to
4     him, were there any videotapes that you know of that
5     would capture his arrest?
6  A. Not videotapes.
7     Maybe some of the audio.
8  Q. Okay. Were people mic'd up?
9  A. Yes, sir.
10 Q. Okay. And do the -- does the audio portion of the
11    recording go to Dispatch, or how is that recorded; if
12    you know?
13 A. It goes to the scout car. Each officer has a mic, and
14    it syncs to the scout car, and that goes with them like
15    when they exit the vehicle, such as -- I know McKibben,
16    I believe, and Barnhill's both had audio.
17    Unfortunately, my audio wasn't -- wasn't there. It
18    was there initially, but it's now gone.
19 Q. Okay. So, you also had an audio of what you were saying
20    at the scene; correct?
21 A. Correct.
22 Q. And part of that audio would capture you telling
23    McKibben to get off Mr. Pellow?
24 A. Correct.
25 Q. Okay. And that audio was gone?

Page 29

1  A. Well, that day that it occurred, I went back to the
2     station, and part of my responsibility is to lock all
3     the video so they don't disappear, and that's what I did
4     for McKibben, Barnhill and myself.
5     And I remember reviewing them. And my audio had
6     captured me ordering McKibben off of Pellow's back and
7     me talking to Captain Matheney in regards to what
8     occurred.
9  Q. Well -- and you're 100 percent certain that you
10    preserved that recording; correct?
11 A. Yes, I did.
12 Q. Okay. Who has authority to -- let me ask you this
13    question: Once the evidence, like your recording, is
14    locked, how could it be erased?
15 A. I think the videotapes are still there.
16 Q. Okay.
17 A. But the audio from my video is not -- was not part of
18    Mr. Listman's disk when we reviewed it a couple weeks
19    ago.
20 Q. Okay. And how is that possible as far as you understand
21    it?
22 A. I don't know.
23 Q. Okay. Do other people within the department have
24    authority to get that evidence, like the recordings?
25 A. You say "authority"?

**Page 30**

1   I mean they maintain it. They store it. They've
2   got it.
3   Q. Right.
4      But I guess what I'm trying to figure out is,
5   whoever has it, whoever got it, can they delete it?
6   A. Well, it's been deleted off of this disk. I mean, I
7   don't know how -- I'm not very technically savvy, and I
8   don't know how you reproduce a disk without the sound,
9   but once you go lights and sirens on a scout car, the
10  transmission and audio automatically goes on, and it was
11  on for all three of the scout cars.
12  Q. Is it digital?
13  A. I don't know.
14  Q. Okay. I'm just curious. I know some departments still
15  use videotapes; others use little cards.
16     I'm trying to figure out, do you guys -- if you
17  know, that's fine.
18     Do you know if you use like a flash drive, a thumb
19  drive, or videos?
20     If you don't know, that's fine.
21  A. It's a microphone that's probably about the size of
22  that, a little bit smaller. It's got a clip. You can
23  put it in your pocket, clip it on your shoulder, on your
24  waistband --
25  Q. I got it.

**Page 31**

1   A. -- and on your belt. It all depends on the officer's
2   preference.
3      And then when you get back to the station, it
4   downloads it from the hard drive from the trunk to the
5   hard drive at the police department. It just
6   automatically syncs and downloads. Other than that, I
7   don't have any technical knowledge of how that works.
8   Q. That makes two of us.
9      And when you're reporting to the device, there's a
10  recording device that's maybe -- I don't know -- 3
11  inches by 2 inches? Maybe 4 by 2? Something like that?
12  A. That's approximate. I would say just a -- that same
13  size, just slightly smaller.
14  Q. Okay. Other than your lawyer, did you -- and Captain
15  Matheney, did you tell anyone else what you saw McKibben
16  do with Pellow?
17  A. No.
18  Q. Okay. Other than your lawyer and other than me today,
19  has anybody asked you about what happened with Nathan
20  Pellow?
21  A. Well, I'm sorry. The last question you just asked me, I
22  told Matheney. I don't know if you --
23  Q. I did. I understand you told Matheney.
24  A. Matheney and then --
25  Q. But nobody else in the City of Warren other than

**Page 32**

1   Matheney?
2   A. No.
3   Q. Okay.
4   A. Third in command. I felt that that was more than
5   sufficient.
6   Q. Okay. And has anybody other than your lawyer inquired
7   of you or asked you what happened with Nathan Pellow?
8   Anything?
9   A. No.
10  Q. Okay. I mean, you've been in the City of Warren for 16
11  years before this; correct?
12  A. Yes, sir.
13  Q. All right. Has anything like this, where there's maybe
14  a police officer acting inappropriately, been swept
15  under the rug in your experience?
16  A. Yes.
17  Q. Okay. And can you give me some examples?
18  A. I don't know. I would --
19     MR. LISTMAN: I think this --
20  A. I'm not -- I can't remember. I mean, there's been so
21  many different things over the years. I mean, I can't
22  give you specifics right now.
23  BY MR. SKLAR:
24  Q. I'll be more specific.
25     Has the Warren Police Department destroyed evidence

**Page 33**

1   as far as you know?
2      MS. DRUZINSKI: Objection. Form. Foundation.
3   Calls for speculation.
4   BY MR. SKLAR:
5   Q. In situations -- I got it.
6      Has the City of Warren Police -- has the Warren
7   Police Department ever destroyed evidence?
8   A. They destroy evidence all the time.
9   Q. Okay.
10  A. When you say that, I just want to make it clear that we
11  have a property room and evidence is destroyed.
12  Q. Well, I apologize.
13     I mean in a way that's not appropriate?
14  A. Not to my knowledge.
15  Q. Okay. Has evidence ever -- in this case, you said that
16  there was -- your recording is gone; correct?
17  A. Yes.
18  Q. That there's -- in Exhibit 2, there is a report that's
19  attributed to you that never -- you never wrote;
20  correct?
21  A. I did not generate that report.
22  Q. And have you ever seen anything like this before where,
23  you know, either recordings are missing or lost, or
24  reports are fabricated? Have you ever seen that before
25  in your 16 years in the City of Warren?

Page 34

1  A. I've seen recordings disappear, yes.
2  Q. Okay. And is it your understanding that they disappear
3     to protect people either from being sued or being
4     criminally charged?
5  A. I don't know.
6     MS. DRUZINSKI: Objection to form and foundation.
7  BY MR. SKLAR:
8  Q. Okay. What other information do you have about
9     Mr. Pellow that you think is important?
10 A. The only other thing was, I sent an e-mail after I was
11    terminated to hire Howard Shifman -- I'm not sure his
12    position, labor relations, labor attorney -- the
13    executive lieutenant of the police department, Lawrence
14    Garner, the union president, James Moore, my criminal
15    attorney at the time, Steve Kaplan, and then another
16    attorney that I was speaking to that I was -- for a
17    civil matter at the time, but I never did go with her.
18    And it had outlined the Pellow matter. It was August
19    of -- 21st of '14, which was well before the filing of
20    this lawsuit.
21 Q. Okay.
22 A. But after my termination.
23 Q. And what -- as best -- do you have a copy of that
24    e-mail?
25 A. I do on my phone, yes.

Page 35

1  Q. Okay. Could I get a copy of it?
2     MR. LISTMAN: We'd have to review it.
3     MR. SKLAR: Oh, absolutely.
4  A. Keep in mind, that's one section. What I was doing was
5     sending it basically to my union attorney due to my
6     termination because there was an arbitration and all
7     this kind of thing coming up, and it outlined a number
8     of different issues that I had with the police
9     department, and it was 1 of about a 30-page document.
10 BY MR. SKLAR:
11 Q. Wow.
12 A. So, a lot of it is very personal information.
13 Q. I understand. And I'm not looking to get into things
14    that are super private. I want to really deal with
15    this.
16    What did your e-mail indicate about the Pellow
17    situation?
18 A. Specifically what I told you here.
19 Q. Okay. What you've testified here today?
20 A. Yes, sir.
21 Q. And subsequent to that e-mail, do you know if there was
22    any internal investigation or external investigation
23    concerning how the Warren Police Department dealt with
24    the Pellow matter?
25 A. Not to my knowledge.

Page 36

1  Q. Okay. Do you know of any investigation conducted by
2     anybody, other than what we're doing as plaintiffs, into
3     how your recording got lost or destroyed?
4  A. I didn't know until about two weeks ago.
5     Actually, it wasn't even two weeks ago. It was
6     less than two weeks ago because the first time I met
7     with Mr. Listman, he didn't even have my recording, and
8     I requested it. And then the next time we met -- I
9     don't know -- three or four days later, he had it, and
10    then we reviewed it at that time.
11 Q. Okay. Has there been any investigation as far as you
12    know into the police report that is -- that is contained
13    in Exhibit 2 that's attributed to you?
14 A. I'm sorry. Could you --
15 Q. Yeah.
16 A. -- ask that question again?
17 Q. Yeah. I apologize.
18    As far as you know, has there been any
19    investigation into how a police report attributed to you
20    that concerns Mr. Pellow exists?
21 A. No.
22    MR. SKLAR: All right. Let me just step outside
23    with my client.
24 A. Okay.
25    (Short recess at 3:23 p.m.)

Page 37

1          * * *
2     (Record resumed at 3:31 p.m.)
3  BY MR. SKLAR:
4  Q. Before Mr. McKibben stood and bounced on Mr. Pellow, who
5     was handcuffed at the time, was Mr. Pellow in any
6     distress as you could see?
7  A. Could you describe "distress," please?
8  Q. Yeah.
9     Was his face purple? Was he having a hard time
10    breathing?
11 A. Well, he had just fought with several people, so he was
12    breathing heavy, out of breath. I remember him only
13    having shorts on, no shirt, socks, pants. I remember
14    him being very dirty, obviously from the scuffle.
15 Q. And the officers were breathing heavy, too?
16 A. Yes. Yes.
17 Q. Okay. So, Mr. -- before McKibben does what he does,
18    Mr. Pellow was breathing as heavy, as far as you could
19    see, as the officers that were involved with him?
20 A. About equal.
21 Q. Okay. And after McKibben steps and bounces on
22    Mr. Pellow, who was handcuffed, after that ends, does
23    Mr. Pellow's condition physically change?
24 A. Yes.
25 Q. How?

**Page 38**

1  A. I did notice his face had turned a darker purple or
2     reddish-purple, and he wasn't just breathing heavily.
3     It seemed like it sort of moved to a gasp. And that's
4     what really got my attention, and that's why I ran to
5     the firemen to summon them to treat Pellow.
6  Q. Okay. Did you tell any of the firemen what had
7     happened?
8  A. No. I just told them that, "Hey, this guy needs some
9     help."
10 Q. Did you see Mr. Pellow with any blood?
11 A. No.
12 Q. All right. If -- in Exhibit 2, I understand that time
13    you didn't write the report that's attributed to you.
14       Do you have any idea who did?
15 A. No, sir.
16 Q. Okay. And, finally, I don't want to get into your
17    criminal matter other than what is the charge?
18       MR. LISTMAN: Again, we're going to place an
19    objection on the record.
20       MR. SKLAR: Okay. That's fine.
21       MR. LISTMAN: Under the Fifth Amendment and FRE 404
22    and FRE 609.
23       MR. SKLAR: And I understand.
24       Okay. I have nothing else for you, sir.
25 A. Thank you.

**Page 39**

1       MS. DRUZINSKI: I have some questions for you, sir.
2                    * * *
3                 EXAMINATION
4  BY MS. DRUZINSKI:
5  Q. I'd like to go through in a little more detail your
6     arrival and some of the things that happened.
7        You said you were contacted by Dispatch; correct?
8     That was the reason that you were brought to the scene?
9  A. Dispatch was looking for another car, and no one was
10    responding. And I was on the road. We typically don't
11    respond -- they don't dispatch supervisors, so I
12    volunteered for it. I told Dispatch that I'm a long
13    ways off, and I started heading that way.
14 Q. About how long do you think it took you from the time
15    you told Dispatch you were on your way until you got to
16    the scene?
17 A. Well, I was somewhere in the Van Dyke -- between Eight
18    and a half and Nine Mile area, and they were at between
19    Ten Mile between Ryan and Dequindre. That's about
20    4 miles, I'm guessing, 4 to 5. Maybe 4 minutes,
21    roughly, 5 minutes.
22 Q. Did you have lights and sirens on, on the way there?
23 A. Yes, I did.
24 Q. Now, you said you arrived and you saw Barnhill, McKibben
25    and four to five firefighters; correct?

**Page 40**

1  A. That's correct.
2  Q. Do you know the identity of any of the firefighters?
3  A. I do not know any firefighter in the City of Warren. I
4     know lots of their faces, but I know none of them
5     personally, or any of their names.
6  Q. Do you know why the firefighters were there?
7  A. I believe it might have went out as an injury accident.
8     So, if it's an injury accident, both police and fire are
9     dispatched to the location.
10 Q. And when you say an "injury accident," you mean a motor
11    vehicle accident?
12 A. Yes.
13 Q. Okay. Because it's my understanding, based on the
14    reports attached or that we've marked as Exhibit 2, that
15    the Plaintiff had driven a vehicle into one of the
16    mobile homes; correct?
17 A. Yes.
18 Q. Okay. So, it was reported to Dispatch as a motor
19    vehicle accident; is that correct?
20 A. Yes, ma'am.
21 Q. Okay. So, you arrive on scene.
22       And tell me where you saw Barnhill and McKibben,
23    please?
24 A. Specifically, they were all together on top of
25    Mr. Pellow when I arrived. Where they were in the mix,

**Page 41**

1     I couldn't tell you.
2  Q. Okay. Where was your vehicle in relation to the mobile
3     home that is pictured in Number 1 here?
4  A. This is east, west, south, north.
5        So, I'm coming up from Ten Mile, and I had passed
6     them. And one of the officers, while they were tussling
7     with Mr. Pellow, said, "Hey, Sarg, you passed us."
8        Because I didn't see them. I went right by them,
9     because right here was the fire truck. So, I passed
10    them probably 150 feet, 200 feet. That's just an
11    estimate.
12       I stopped, backed up once I was about somewhere
13    around here, and then I exited and ran over to them.
14 Q. So, you would have been driving past them, and they
15    would have been on your right-hand side?
16 A. Left-hand side.
17 Q. They would have been your left-hand side.
18       So, you --
19 A. I was traveling north, and they were on the west side.
20 Q. Okay. So, as you were driving northbound, you didn't
21    see them on your left-hand side in front of the mobile
22    home? You actually drove past them about 150 feet?
23 A. Approximately.
24 Q. Okay. And then you heard somebody call out to you.
25       Do you know who that was?

Page 42

1  A. No.
2     It was on the police radio, so it was either
3     McKibben or Barnhill, one of the two.
4  Q. Okay. And so during that time, do you think they were
5     still interacting with Plaintiff, trying to get
6     Plaintiff under control?
7  A. Yes.
8  Q. But they were able to contact you and say, "Sarg, you
9     passed us"?
10 A. Yes.
11 Q. Did it sound like they were in distress at all?
12 A. I don't remember.
13 Q. Okay. So, then you back up, and you park your squad car
14    roughly parallel to the mobile home; is that correct?
15 A. It would be perpendicular, actually.
16 Q. Oh, perpendicular. I'm sorry.
17 A. Yes.
18 Q. Basically -- you're right. Sorry. That would have been
19    difficult parking.
20    Perpendicular to the home, basically in line with
21    the home?
22 A. Yes, ma'am.
23 Q. Okay. So, you're now able to see them to your left?
24 A. Yes.
25 Q. And what did you see at the time you were looking to

Page 43

1     your left?
2  A. I just saw a mass of people at that time. So, I just
3     exited, and I ran over to them. And they were, I guess,
4     100 feet, maybe 150 feet.
5     So, I just ran up to this area, and they were all
6     in this area. Mr. Pellow's head was facing towards the
7     trailer. His feet were this way, and all the firemen
8     and police were on top of him.
9  Q. Okay. So, when you say you "saw a mess," you saw what
10    would be two officers and four to five firemen all on
11    top of the Plaintiff at the same time?
12 A. Yes.
13 Q. Okay. And did you say anything to anybody while you
14    were running up?
15 A. While I was running up, no.
16 Q. Do you know specifically where McKibben and Barnhill
17    were in that -- what you called "a mess of people"?
18 A. No.
19 Q. Do you know if they were on his back, on his legs,
20    standing next to him? Do you know specifically where
21    they were standing?
22 A. No.
23 Q. Okay. Do you know if anybody was standing on the back
24    of the Plaintiff at that time?
25 A. No.

Page 44

1  Q. Okay.
2  A. No one was standing on his back at that time.
3  Q. Okay. So, everybody was standing around him?
4  A. They were like kneeling on him and trying to, you know,
5     muscle his arms together to get him handcuffed.
6  Q. Was he resisting at that time?
7  A. It appeared to be, yes.
8  Q. Okay. So, who did you see handcuff the Plaintiff?
9  A. I did not see who specifically handcuffed him.
10 Q. So, when you stood close enough to where you could -- I
11    would say within a few feet of him, did he have
12    handcuffs on his hands?
13 A. Not when I initially approached, no.
14 Q. Okay. Who did you see handcuff him?
15 A. I did not see anyone actually handcuff him.
16    He was handcuffed eventually, but I was assessing
17    the whole situation.
18 Q. So, you're not sure who actually handcuffed him?
19 A. No, ma'am.
20 Q. Okay. And I believe this might have been asked earlier,
21    but did he have -- you're not sure if he had cuffs on
22    his ankles; correct?
23 A. No. I read that in a report, and I've never personally
24    handcuffed anyone's ankles. And I did not see anyone
25    handcuff his ankles.

Page 45

1  Q. Okay. But he did have handcuffs on his wrists, and his
2     hands would have been behind his back; correct?
3  A. Yes, ma'am.
4  Q. Okay. And then who rolled him over?
5     Or, actually, I should step back.
6     Did you see anybody roll him over at that time, or
7     was he laying prone on his stomach?
8  A. He was still prone on his stomach.
9  Q. Okay. Did you speak to the Plaintiff at any time while
10    he was laying on the ground?
11 A. No.
12 Q. Which officer did you speak with first when you arrived
13    on the scene?
14 A. I think the first thing I actually said was probably,
15    "McKibben, get off of him."
16    Because I didn't actually participate. I'm just
17    assessing the scene, and they're getting him under
18    control, and he was cuffed quickly after I arrived. And
19    the firemen had gotten up. Barnhill had gotten up.
20    McKibben had stayed with Pellow, and that's when a
21    female approached me. And I had walked over to
22    somewhere around this area.
23 Q. You're pointing to the table and the picture.
24    So, how many feet away from the Plaintiff do you
25    think you walked?

Page 46

1   A. Like 15, 20 feet.
2      That's just a guess.
3   Q. Okay. And when you're 15 or 20 feet away, where are
4      McKibben and Barnhill?
5   A. I don't know where Barnhill is, but McKibben is over
6      here with Pellow.
7   Q. Standing right next to Pellow?
8   A. I don't know if he was standing next to him. He was --
9      I don't know where he was at that time when I approached
10     the white female.
11  Q. Okay. And who was -- you don't know who the white
12     female is?
13  A. No.
14  Q. Is it the woman sitting across from you?
15  A. I couldn't tell you.
16  Q. Okay. Did you get her name?
17  A. No.
18  Q. And what did she tell you?
19  A. We didn't have any interaction. It was -- she was
20     walking up to me, and we were walking together, and she
21     was looking over my shoulder -- my right shoulder, and I
22     just naturally responded, and McKibben was on
23     Mr. Pellow's back.
24  Q. Okay. About how soon after you saw all the officers
25     step away from the Plaintiff did this female approach

Page 47

1      you?
2   A. Just a couple seconds.
3   Q. Okay. So, in the couple seconds that you turned and
4      walked about 15 feet away, it's your testimony that
5      McKibben went and stood on Plaintiff's back and started
6      bouncing?
7   A. Correct.
8   Q. With his two feet, standing right on the center of his
9      back?
10  A. I don't know where they were on his back, but he was
11     standing on top of Mr. Pellow's back.
12  Q. Do you think it was on -- can you tell me where on his
13     body he was standing?
14  A. No, ma'am.
15  Q. It was just somewhere while he was laying down?
16  A. Yes.
17  Q. How long was he standing on the Plaintiff's back?
18  A. When I looked over my shoulder, I immediately ordered
19     him off of Pellow. So, it couldn't have been more than
20     a few seconds.
21  Q. Okay. You had your audio, your mic on?
22  A. Yes.
23  Q. McKibben had his mic on?
24  A. Yes.
25  Q. Barnhill had his mic on?

Page 48

1   A. Yes.
2   Q. Did you listen to the audio from all of the officers?
3   A. Not the entire -- I just locate the videos, and then I
4      lock them so they don't get purged from the system
5      because they get purged after approximately -- I -- it
6      was 30 days. The Vision Hawk system is an older system,
7      and it wasn't very good. So, you have to lock them
8      pretty quick, and when they get unlocked, they
9      disappear.
10     So, I locked them, and I just briefly looked at
11     them. I don't think I looked at them from beginning to
12     end.
13  Q. Okay. It was a little different question than what I
14     was asking.
15  A. Oh, I'm sorry.
16  Q. That's okay. No. That was maybe a poor question on my
17     part, so I'll start there.
18     Were you in charge of the records at the time?
19  A. No.
20  Q. Okay. Who was in charge of records?
21  A. John Barnes.
22     I believe he's still in charge of records.
23  Q. Do you know if it's possible to remove audio from the
24     video?
25     In other words, how do you have the video but take

Page 49

1      away the audio?
2   A. I don't know.
3   Q. So, then my question was, when you reviewed -- it's my
4      understanding you reviewed some of the video and the
5      audio with your attorney; right?
6   A. Yes.
7   Q. Okay. And I don't want to know anything that you said
8      to the attorney or what your attorney said to you, but
9      did you listen to the audio from either McKibben or
10     Barnhill?
11  A. We went over the McKibben one a couple times. I don't
12     remember if we went over Barnhill's. I think we glanced
13     at it, but I -- you'd have to refresh my memory. I
14     don't remember.
15  Q. Did you hear yourself on McKibben's audio?
16  A. We only listened to it once, and it's on speakers,
17     unfortunately. It's not very good quality, so there's a
18     lot of static. I may have heard myself once or twice,
19     but I'm not positive. I'd have to listen to it again.
20  Q. When you told McKibben to get off the Plaintiff's back,
21     did McKibben respond to you verbally in any way?
22  A. No.
23  Q. Did you hear yourself on McKibben's video -- or -- I'm
24     sorry -- McKibben's audio, telling him to get off his
25     back?

Page 50

1  A. No.
2  Q. Did you hear yourself on Barnhill's audio telling
3     McKibben to get off the Plaintiff's back?
4  A. No.
5  Q. And this incident is not captured on any of the squad
6     car videos?
7  A. No.
8  Q. Now, when you went back and locked the audio and the
9     video, did you lock a specific time, or do you just lock
10    the audio and video for that shift?
11 A. Just lock it for the entire segment of that incident.
12    Sometimes -- it's sort of -- I don't remember all the
13    details, but that Vision Hawk system isn't very good.
14    Sometimes it breaks it into segments if it -- sometimes
15    you'll get a whole shift in one -- in one block that you
16    can lock. Sometimes it's only per incident. It depends
17    on if the officer shuts it off, if he changes cars, if
18    he goes back to the station, and it will download -- it
19    used to download automatically. So, this was, I
20    believe, at 11:00 or 12:00 in the morning. If they had
21    gone to an accident, say, 9:00, or had a death of some
22    kind or some kind of other incident, and they had gone
23    back to the station to go to the bathroom or write a
24    report or see a supervisor or do whatever, when their
25    car is close to the police department, it automatically

Page 51

1     downloads.
2        So, if I were to -- I don't know if I'm answering
3     your question, but that would not have been locked
4     because that would have already been downloaded. That
5     would have been a different segment of the video for
6     that officer that day.
7  Q. So, is -- was there any way for you to lock the video
8     but not the audio?
9  A. No.
10 Q. Did you have your mic on that day?
11 A. Yes.
12 Q. Are you positive?
13 A. Yes.
14 Q. How do you know?
15 A. Because I listened to the video when I got back to the
16    station.
17 Q. And that was before or after you locked it?
18 A. I don't remember. I listened to it and locked it at the
19    same time. I don't remember if I located it and locked
20    it and listened to it, or if I listened to it and then
21    locked it. I don't remember.
22 Q. So, back to the scene.
23    You see McKibben standing on the Plaintiff's back.
24    You tell him to get off.
25    And then what does McKibben do?

Page 52

1  A. He gets off.
2  Q. And then where does McKibben go?
3  A. I don't know because I ran to the firemen.
4  Q. And how far away are you at this point from Plaintiff?
5     About 15 or -- 10 or 15 feet away, I think you said?
6  A. 15 or 20, yeah. 15, 20 feet, roughly.
7  Q. And you said he -- you saw his face start to turn red or
8     purple?
9  A. Correct.
10 Q. And was that immediately as McKibben stood off of him?
11 A. I looked at him right away, and, yes, he was a different
12    color. He was darker purple.
13 Q. And did the firefighters perform any kind of medical
14    treatment on the Plaintiff on scene?
15 A. I don't remember.
16    I know that they had went to Mr. Pellow, loaded him
17    up and then took him away. I would imagine they
18    probably did, but I can't say that I saw something.
19 Q. So, after they take Mr. Pellow away, what do you do?
20 A. I request evidence technicians and the detective bureau,
21    and I start -- I told an officer to stay here at the
22    scene so no one messes with anything here. I ordered
23    another officer over at the scout car -- or not the
24    scout car -- the accident scene. Matheney showed up
25    shortly thereafter.

Page 53

1     I remember going into Mrs. Pellow's trailer and
2     talking to her two sons who were playing video games
3     that day, and I didn't know that Mr. Nathan Pellow
4     wasn't their father. I felt sort of bad for the kids,
5     you know, because I found out right around that same
6     time that he had passed away. So, I was in the trailer
7     with Mrs. Pellow, and I think a couple other officers
8     showed up around the same time.
9  Q. And so at what point did you go back to the station that
10    day?
11 A. I don't remember.
12 Q. Sometime that shift?
13 A. Yes.
14 Q. And that's when you asked Captain Matheney to have a
15    debriefing?
16 A. Correct.
17 Q. Now, you said, based on reading the reports, you assumed
18    that a debriefing occurred based on some of the language
19    used by the other officers in the reports; is that
20    correct?
21 A. Correct.
22 Q. Do you have any evidence that establishes that this
23    debriefing ever took place?
24 A. No. That's just a practice based on that language, that
25    usually officers are told by their union president and

Arthur Leslie Gill                                                May 10, 2016

### Page 54

1. lawyer -- usually a union lawyer/attorney is called in
2. on something like this, and they sort of put that
3. language in there. I don't know if it protects them in
4. some kind of way. But that's usually what happens.
5. Q. But you have no idea if a debriefing ever took place?
6. A. I do not.
7. Q. Did you ever ask any of the other officers that were on
8. scene whether a debriefing ever took place?
9. A. I did not.
10. Q. And it's your testimony today that you did not write the
11. report that has your name on it; correct?
12. A. That is correct.
13. Q. Why didn't you write a report?
14. A. Because protocol is you have a debriefing and then you
15. write the report afterwards.
16. Q. Have you ever -- have you ever written a report without
17. having a debriefing?
18. A. On a death like that, no.
19. Q. So, is protocol, then, if a briefing doesn't take place,
20. you simply don't write a report?
21. A. It depends on -- what you're saying is, we write lots of
22. reports. I probably have written tens of thousands, if
23. not 100,000 reports in my life. But when there's a
24. death like this, there's a debriefing. If there's a
25. shooting, if there's some kind of death related to

### Page 55

1. officer action, there's a debriefing.
2. I've never written a report without that
3. debriefing.
4. Q. So, why didn't -- so, it's your testimony that you saw
5. another officer stand on the back of someone, and it's
6. your testimony that you think he passed away soon after
7. that.
8. Why didn't you think it was important enough to
9. memorialize that in a report?
10. A. Because I can't write a report until after the
11. debriefing. And I told the third in command at the
12. police department what had occurred, and I was waiting
13. for him, when it was convenient for him, to have that
14. debriefing. Then I would have written the report.
15. Q. So, rather than memorialize this incident in a report,
16. you waited two weeks, and then, I believe you said,
17. moved on; right?
18. A. Correct. That's correct.
19. Q. Did you ever -- within those two weeks ever write any
20. notes to yourself or notes to anybody else to try and
21. memorialize this event before your memory faded?
22. A. No.
23. Q. Now, you testified that you were terminated from the
24. City of Warren on April 17th, 2014; correct?
25. A. That is correct.

### Page 56

1. Q. And Plaintiff counsel may have asked you this.
2. Do you think this incident had anything to do with
3. your termination?
4. MR. LISTMAN: I'm going to again place the
5. objection on the record with regard to any questions
6. regarding his termination under FRE 404, FRE 609 and the
7. Fifth Amendment.
8. BY MS. DRUZINSKI:
9. Q. You don't like the City of Warren; right?
10. A. I love them. I chose to get hired -- I chose that
11. position over about a dozen other police departments
12. that had offered me employment.
13. Q. Are you upset that they won't hire you back right now?
14. A. Arbitration is coming up, and that should be a win
15. easily.
16. Q. What if you're not hired back?
17. A. I've got --
18. MR. LISTMAN: Objection. I don't think there's a
19. question on the ground at this point. So --
20. BY MS. DRUZINSKI:
21. Q. What criminal charges are currently pending against you?
22. MR. LISTMAN: Objection, again, under FRE 404, FRE
23. 609 and the Fifth Amendment.
24. MS. DRUZINSKI: Well, I want to -- I just want to
25. know what charges are pending, though, which I think

### Page 57

1. that is permissible to advise what charges are currently
2. pending.
3. MR. LISTMAN: Well, we're going to leave the
4. objection. I'm sure you can do your own research.
5. BY MS. DRUZINSKI:
6. Q. Does that have anything to do with the City of Warren?
7. A. Yes.
8. Q. Have you ever spoken to the Plaintiff attorney regarding
9. this case?
10. A. Yes, I have.
11. Q. When did you speak with him?
12. A. July 2nd, I believe.
13. Q. What did you guys discuss?
14. A. I requested a copy of the Complaint because the City of
15. Warren had had it for about six weeks and didn't forward
16. me my copy.
17. Q. What else did you guys discuss?
18. A. That was it.
19. Q. Did you discuss with him your thoughts about the case or
20. what you believe happened?
21. A. No.
22. Q. Did you discuss this case with anybody from Plaintiff's
23. family?
24. A. No.
25. Q. Is that July 2nd discussion with Plaintiff's attorney

Arthur Leslie Gill                                                    May 10, 2016

Page 58

1   the only time you spoke with him?
2   A. Yes.
3   Q. Was that via telephone or via e-mail or via letter?
4   A. That was a phone call.
5   Q. Did the City of Warren ever provide you with a copy of
6      the Complaint?
7   A. You did, yes.
8   Q. Just making sure.
9   A. It was July 27th, about two months after it was filed.
10  Q. You were being represented at the time; right?
11  A. Yes, I am.
12  Q. Have you ever spoken with Captain Matheney regarding
13     this incident since it occurred?
14  A. No.
15  Q. What about Commissioner Green or anybody else with
16     higher authority than Captain Matheney?
17  A. No.
18  Q. Have you spoken with anybody from the press regarding
19     this incident?
20  A. Yes, I have.
21  Q. Who have you spoken to?
22  A. Norb Franz.
23     THE REPORTER: I'm sorry. The name?
24  A. Norb Franz from The Macomb Daily, N-o-r-b F-r-a-n-z.
25     He's been doing an ongoing story about my whole

Page 59

1   situation here.
2   BY MS. DRUZINSKI:
3   Q. When did you last speak with him?
4   A. It's been months. I'm not sure. I'd have to look at my
5      e-mail.
6   Q. Were you involved in any IA investigations regarding
7      this incident?
8   A. The Pellow matter?
9   Q. Yes.
10  A. No.
11  Q. Do you know if anybody was?
12  A. I do not know.
13  Q. Were you the officer in charge of this incident?
14  A. The officer in charge would be a detective. I believe
15     it said in the reports Nearing was the OIC.
16     MS. DRUZINSKI: I have no further questions for
17  you, sir.
18     Your attorney may have some.
19     MR. LISTMAN: I've got just two questions. Give me
20  one second.
21           * * *
22           EXAMINATION
23  BY MR. LISTMAN:
24  Q. Okay. Mr. Gill, I want to be very clear on this.
25  A. Uh-huh.

Page 60

1   Q. Did you at any time during the Pellow incident on August
2      30th, 2013 touch Mr. Pellow in any way?
3   A. No.
4   Q. Did you at any time on August 30th, 2013 physically
5      touch Mr. Pellow in any way?
6   A. No.
7   Q. So, you didn't kick Mr. Pellow on August 30th, 2013?
8   A. No.
9   Q. You didn't hit Mr. Pellow on August 30th, 2013?
10  A. No.
11  Q. I just want to be absolutely 100 percent clear.
12     On August 30th, 2013, you did not hold, hit or
13     physically touch Mr. Pellow in any way?
14  A. I did not.
15     MR. LISTMAN: Thank you.
16     MR. SKLAR: Okay. I just have some follow-up.
17           * * *
18           RE-EXAMINATION
19  BY MR. SKLAR:
20  Q. And I'm going to try to summarize what the testimony is
21     so far today.
22     Is -- on August 30th, 2013, there comes a point in
23     time where Mr. Pellow is face down and handcuffed;
24     correct?
25  A. That's correct.

Page 61

1   Q. He is no longer a threat of flight; correct?
2   A. It didn't appear to be, no.
3   Q. Right.
4      No longer a threat of fight; correct?
5   A. He -- it didn't appear to be much of a threat.
6   Q. And then you see Officer McKibben stand on Mr. Pellow's
7      back and bounce?
8   A. Correct.
9   Q. And Mr. Pellow's physical condition changes for the
10     worse after that event?
11  A. It changed from being red in the face and breathing
12     heavily to purple and more or less, for better lack of a
13     word, gasping.
14  Q. And at the time that Officer McKibben stood and bounced
15     on Mr. Pellow's back, EMS was about to leave the scene;
16     correct?
17  A. I'm not sure if they were leaving the scene.
18  Q. But they had left the area of Mr. Pellow?
19  A. They had left the area of Mr. Pellow.
20  Q. As had the other officers?
21  A. Yes.
22  Q. Okay. Now, how much -- how tall, from your estimation,
23     is Officer McKibben?
24  A. I'm about 6 foot.
25     I would say he's 6 foot, 6 foot 1.

Page 62

1  Q. About how much does he weigh from your estimation?
2  A. My guess would be 230 to 250.
3  Q. Okay. And you never wrote a report concerning this
4     incident, even the one that appears in Exhibit 2;
5     correct?
6  A. That is correct.
7  Q. And the audio portion of your recording which you locked
8     and preserved has disappeared; correct?
9  A. It's not on the copy that Attorney Listman showed me.
10        MR. SKLAR: Okay. I have nothing else. Thank you.
11              * * *
12              RE-EXAMINATION
13 BY MS. DRUZINSKI:
14 Q. Did you ever threaten to kill anybody at the Warren
15    Police Department?
16 A. No.
17        MS. DRUZINSKI: Okay. No further questions.
18        MR. SKLAR: Okay. Thank you, sir.
19        MR. LISTMAN: That's it. I'm done.
20        MR. SKLAR: Thank you so much. I appreciate your
21     time.
22        THE REPORTER: Joel, do you want to order the
23     transcript?
24        MR. SKLAR: Yeah, I do.
25        THE REPORTER: Thank you.

Page 63

1      Julie, do you want a copy?
2         MS. DRUZINSKI: Of course.
3         THE REPORTER: Thank you.
4         MR. LISTMAN: Copy.
5         MS. DRUZINSKI: Do E-trans.
6         THE REPORTER: Only?
7         MS. DRUZINSKI: Yeah, on paper, but E as well.
8         THE REPORTER: Okay.
9         MS. DRUZINSKI: Thank you.
10        THE REPORTER: Thanks.
11     (Deposition concluded at 3:59 p.m.)
12              * * *

Page 64

1  STATE OF MICHIGAN )
2  COUNTY OF OAKLAND )
3        CERTIFICATE OF NOTARY PUBLIC
4     I do hereby certify that the witness, whose
5  attached testimony was taken in the above matter, was
6  first duly sworn to tell the truth; the testimony
7  contained herein was reduced to writing in the presence
8  of the witness by means of stenography; afterwards
9  transcribed; and is a true and complete transcript of
10 the testimony given.
11    I further certify that I am not connected by blood
12 or marriage with any of the parties; their attorneys or
13 agents; and that I am not interested, directly or
14 indirectly, in the matter of controversy.
15    In witness whereof, I have hereunto set my hand
16 this day at Highland, Michigan, County of Oakland, State
17 of Michigan on Thursday, May 12, 2016.
18
19    _____
20    John J. Slatin, RPR, CSR-5180
21    Certified Shorthand Reporter
22    Notary Public, Oakland County, Michigan
23    My commission expires: July 25, 2017