UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DISTRICT

JENNIFER PELLOW as Personal
Representative of the Estate of
NATHAN WESLEY PELLOW,

Case No:  15-11765

Hon. Terrance G. Berg
Magistrate R. Steven Whalen

     Plaintiff,

v.

KEVIN BARNHILL, SHANE MCKIBBEN,
ROBERT ROY, JOHN ADAMS, and
DALE VAN HORN, Jointly and Severally,

     Defendants.

---

BEN M. GONEK (P43716)
Law Offices of Ben Gonek, PLLC
Attorneys for Plaintiff
500 Griswold Street, Suite 2450
Detroit, MI 48226
(313) 963-3377

JOEL B. SKLAR (P38338)
Attorney for Plaintiff
500 Griswold Street, Suite 2450
Detroit, MI  48226
(313) 963-4529

JOHN J. GILLOOLY (P41948)
Garan Lucow Miller, P.C.
Attorneys for Defendants
1155 Brewery Park Blvd, Ste 200
Detroit, MI  48207
(313) 446-5501

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY DISPOSITION**

## TABLE OF CONTENTS

Index of Authorities……………………………………………………………………….   iii

Concise Statement of Issue Presented……………………………………………….   iv

Introduction………………………………………………………………………………..   1

Parties……………………………………………………………………………………….   2

Counter-Statement of Material Facts………………………………………………..   3

Legal Argument…………………………………………………………………………..   15

      I.     Although Plaintiff Has the Burden of Proving Defendants
           Are Not Entitled to Qualified Immunity, the Evidence Must
           Be Construed in a Light Most Favorable to Plaintiff……………   15

      II.    Defendants Cannot Contend a Police Officer Acts in an
           Objectively Reasonable Manner when he Stands on the
           Back of a Prone, Securely Restrained Person; Instead They
           Impermissibly Attack the Credibility of Plaintiff's Evidence…..   17

      III.   Far from Demonstrating the Absence of a Genuine Issue
           Of Material Fact, Defendants Raise More Questions than
           They Answer……………………………………………………………….   22

Conclusion………………………………………………………………………………..   33

## INDEX OF AUTHORITIES

*Cases:*

*Anderson v Liberty Lobby, Inc.,* 477 U.S. 242, 255; 106 S. Ct. 2505,
   91 L. Ed. 2d 202 (1986)............................................................... 15

*Baxter v Palmigiano*, 425 US 308, 318 (1976).................................. 22,27

*Celotex Corp v Catrett,* 477 U.S. 317, 325; 106 S. Ct. 2548;
   91 L. Ed. 2d 265 (1986)............................................................... 15

*Chao v Hall Holding,* 285 F. 3d 415, 424 (6th Cir. 2002)................. 15,16

*Feathers v Aey,* 319 F. 3d 843 (6th Cir. 2003).................................. 20

*Hagans v Franklin Cnty. Sheriff's Office,* 695 F. 3d 505, 509 (6th Cir. 2011). 20

*Kent v Oakland County*, 810 F. 3d 384 (6th Cir. 2016)...................... 25

*Lawrence v Madison County*, 2016 US Dist. LEXIS 44089 *21
   (ED KY 3/31/2016)..................................................................... 22

*McKinney v Galvin*, 701 F2d 584, 589 (6th Cir 1983)......................... 22

*Pearson v Callahan,* 555 U.S. 223, 231; 129 S. Ct. 808;
   172 L. Ed. 2d 565 (2009).............................................................. 16,20

*Saucier v Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L Ed. 2d 272 (2001).......... 19

*Scott v Harris,* 550 U.S. 372, 377; 127 S. Ct. 1769; 167 L. Ed. 2d 686 (2007). 16

*United States ex rel. Griffith v Conn,* 2016 U.S. Dist. LEXIS 2089; 2016 WL
   81765; Civil No. 11-157-ART, (E.D. Ky., Jan 7, 2016)............................. 17

## CONCISE STATEMENT OF ISSUE PRESENTED

Are the defendant officers, all of whom took the Fifth Amendment rather than testify, entitled to qualified immunity and summary judgment under the circumstances of this case?

Defendants say Yes.

Plaintiff says No.

## Introduction

While many of the facts are not in dispute, there are two irreconcilable versions of the material facts. If the defense version is accepted, all defendants acted properly, and are entitled to qualified immunity and summary judgment. Unfortunately for defendants, all of whom took refuge in the *Fifth Amendment* rather than give deposition testimony, there is a competing eyewitness version combined with troubling circumstantial evidence suggesting a cover up of incriminating facts.  The competing eyewitness version of material facts was testified to by their superior, former Warren Police Sergeant Arthur Gill. Although defendants say he is disgruntled after being fired, Gill emailed the same version of events to the Warren Police Department even before this lawsuit was anticipated, let alone filed and served. Plaintiff sued him along with the others, not knowing what he would say and relying on a documentary record that Gill says includes a forged report attributed to him but that he did not write. Plaintiff dismissed her action as to him without payment only after his deposition.

It is disappointing that civil defendants who assert their privilege against self-incrimination seek summary judgment. The adverse inference to be drawn from their refusal to testify is central to this motion. Plaintiff did not seek to default them. Their privilege is of constitutional origin. But their refusal to testify

1

deprives the jury of information it will need to evaluate conflicting evidence. Balancing defendants' criminal jeopardy with the right of plaintiff to compel and test the veracity of relevant testimony, the court should at the summary judgment stage (1) assess the evidence in the light most favorable to plaintiff, (2) regard the defendants' characterization of the facts with skepticism, and (3) wonder why anyone in Gill's position would lie under oath to assist the Pellow Estate. [1]

## Parties

Jennifer Pellow ("Plaintiff") is the widow of Nathan Pellow, and the personal representative of his estate. Kevin Barnhill ("Barnhill") is a Warren police officer. He was the first to respond to the incident on August 30, 2013.Shane McKibben ("McKibben") is also a Warren police officer. He was the second to respond, and is the central defendant. Robert Roy ("Roy"), John Adams ("Adams") and Dale Van Horn ("Van Horn") are also Warren police officers, who responded to the scene after Barnhill and McKibben. Roy, Adams and Van Horn are collectively

---

[1] The following exhibits are attached: Exhibit 1, Autopsy report, Bates 901-15; Exhibit 2, Police report excerpts, Bates 813-14, 819-31; Exhibit 3, Gill report, Bates 832-33; Exhibit 4, Photo of Barnhill, Bates 1028; Exhibit 5, Photo of McKibben, Bates 1036; Exhibit 6, Photo of Pellow's back post-mortem, Bates 1023; Exhibit 7, Photo of Jacobs, Bates 1047; Exhibit 8, Partially redacted Gill Answers to Interrogatories and Requests to Produce; Exhibit 9, Declaration of Arthur Gill; and Exhibit 10, Gill employment termination, Bates 220.

referred to as the "Bystander Defendants."

## Counter-Statement of Material Facts

1.    On August 30, 2013 Nathan Pellow was 31 years of age, 6'1', 265 pounds.

He lived in the trailer park where the accident and ensuing incident took

place, with his wife Jennifer and her two sons. Ex 1.

2.    On that day, his vehicle struck a trailer located in the same trailer park.

(Complaint, ¶ 11)

3.    Nathan Pellow was injured in the accident. (Complaint, ¶ 9).

4.    Barnhill was the first to respond. Dispatch informed him as he

approached that there was some reason to believe Nathan Pellow was

an obtunded drug user. Ex 2.

5.    Barnhill and Nathan Pellow interacted. This quickly became a physical

altercation. Nathan Pellow walked away, disregarding Barnhill's

verbal direction to stay on the ground. Ex 2.

6.    Barnhill requested assistance from McKibben, who arrived shortly

after Barnhill. (Complaint, ¶ 13).

7.    Pellow refused to comply with McKibben's and Barnhill's verbal

commands. He continued to walk away from them. Barnhill and

McKibben gave chase. (Ex C, Dashcam Video/Audio—Car 31 at

11:17:05 – 11:20:24); Ex 2.

8. Five Warren firemen arrived as the chase proceeded (Jacobs, Breen, Muirhead, Thrift, Garwood). Because Barnhill and McKibben were having difficulty securing Pellow, they tried to assist. Pellow punched Jacobs in the face during this altercation. Ex 7.

9. McKibben, who is the same height as Pellow but not as heavy, tried to wrestle Pellow to the ground. Pellow fought McKibben off and regained his feet. Ex 2.

10. Barnhill and McKibben tased Pellow multiple times. They maintain this had no effect. Ex 2.

11. Barnhill and McKibben also maintain that Pellow showed no visible reaction to multiple applications of pepper spray to his face. Ex 2.

12. As Pellow fled Barnhill and McKibben, he mounted the front steps of an occupied trailer, and seemed to be trying to enter. Ex 2.

13. Barnhill and McKibben, assisted by the five fire fighters, physically dragged Pellow away from the door and pinned him face down on the steps. In the struggle Pellow was rolled off the steps onto the ground to the right of the steps. While Pellow, face down, struggled and resisted, Defendants and the five fire fighters tried to handcuff him. Ex 2.

14. Pellow was prone and holding his arms under his body, frustrating attempts to cuff him. McKibben tried to force one of his arms out from under his body so he could be cuffed behind his back. One or more of the others simultaneously tried to force the other arm out from under Pellow's body for the same purpose. Ex 2.

15. After a struggle this was accomplished and Pellow was handcuffed behind his back.

16. Sergeant Gill, a supervisor who was about five minutes away, was dispatched to the scene when it seemed there were not enough officers to contain the situation. (Ex J, Gill, p 11; Ex D, at 11:20:40).

17. To get to the scene as quickly as possible, Gill activated his lights and siren. This activated his body mike (Gill dep, p 30, 39)

18. Gill is certain his microphone worked and picked up his verbal interactions at the scene, because he listened to it later that day to make sure what he said was recorded. (Gill, p 29, 51).

19. Within a few seconds of Gill's arrival, the struggle ended. Pellow was cuffed and under control. (Gill, p 14).

20. Gill observed Barnhill, McKibben and the five firemen struggling to subdue Pellow when he arrived. "I just saw a mass of people at that time." (Gill, p

14, 43).

21.   A short time later, with Pellow safely restrained, "Everyone started getting off Mr. Pellow." The firemen walked a short distance away to their rig. Everyone except McKibben began to walk away. (Gill, p 14, 15).

22.   At this point Pellow was out of breath from the struggle, "about equal" to the also somewhat breathless Barnhill and McKibben. (Gill, p 37).

23.   Barnhill and McKibben incurred injuries in the struggle with Pellow, which were photographed at the scene by a department photographer. Ex 4, 5.

24.   At this point, Pellow was no longer resisting, no longer inclined to flight or fight. "He did not appear to be much of a threat." (Gill, p 61).

25.   Pellow, through prone and handcuffed, was alive, breathing but red in the face. (Gill, p 15, 61).

26.   Gill turned his back briefly and walked away. An unknown white female approached him. Before they could have any verbal interaction, she looked over Gill's shoulder, causing him to turn around to see what she was looking at. At that point he saw McKibben standing on Pellow's back, bouncing up and down (Gill, p 15, 16, 61).

27.   Gill immediately ordered McKibben to get off Pellow's back. (Gill, p 15).

28.   McKibben, in response to Gill's order, did get off Pellow's back. (Gill, p 52).

29.     It is a well-recognized violation of police procedure to apply weight to the back of a prone, restrained, obese, physically stressed and possibly obtunded person who has stopped resisting arrest, because of the risk of positional asphyxia. (Gill, p 17).

30.     McKibben weighs between 230 and 250 pounds. (Gill, p 62).

31.     After McKibben stepped off Pellow's back, Pellow's skin had turned darker (red to purple) and his breathing went from heavy to gasping. (Gill, 16, 38).

32.     Recognizing Pellow was in danger, Gill urgently requested that the fire fighters return to help him. (Gill, p 38).

33.     Pellow was rolled over onto his back, assessed, and rushed to the nearest hospital where he was shortly pronounced dead. Ex D, at 11:32:29.

34.     On August 31, 2013, the following day, the Oakland County Medical Examiner performed an autopsy. "The posterior torso shows a fresh bruise in the right mid- portion of the back." The cause of death was "positional asphyxia." Ex 1, 6.

35.     Gill, the ranking police official on site, realized this was "a serious incident." He ordered that the scene be secured, and an evidence technician was summoned. Photographs were taken. During this process, he was informed of Pellow's death. (Gill, p 17, 22, 52).

36. About 20-30 minutes after Pellow was transported to the hospital, Captain Matheney arrived on the scene. Matheney is the third ranking official in the department and Gill's superior. (Gill, p 18, 55).

37. Gill told Captain Matheney what McKibben had done to Pellow, and that Pellow was dead. Matheney's immediate verbal response was "That didn't happen." (Gill, p 19).

38. Gill was concerned by Matheney's dismissive response but somewhat reassured when Matheney promised "we'll have a debriefing." (Gill, p 19).

39. In the argot of the Warren Police Department, a debriefing refers to a group meeting in which all participants in a serious incident compare notes, "get a holistic view of what occurred….sort of piece things together a little better." (Gill, p 22).

40. On the day of the incident, August 30, 2013, Gill returned to the department expecting to participate in the promised debriefing. The debriefing was held by Matheney but he was excluded. All the other defendants authored reports dated 8-30-13 which begin by reciting that the author was required as a condition of his employment, by Captain Matheney, to author the report. Ex 2. This is done not for routine reports but for post-debriefing reports only, and is the result of advice of police union counsel. (Gill, p 54).

41.   Gill's understanding of protocol based on long experience in the department
      is that he was not to write his report until after debriefing. (Gill, p 54).

42.   Gill repeatedly asked Matheney, that day, the following day and several
      times in the ensuing two weeks, when the promised debriefing would take
      place. Matheney redirected him each time, " blowing me off." (Gill, p 23,
      25, 27).

43.   Gill, on the day of the incident and again in 2016, reviewed the video of all
      three cars (Barnhill, McKibben and Gill) as well as the audio. "Part of my
      responsibility is to lock all the video so they don't disappear..." "And my
      audio had captured me ordering McKibben off of Pellow's back and me
      talking to Captain Matheney in regards to what occurred." (Gill, p 29).

44.   Gill is 100% certain he preserved his recording but that it no longer is
      preserved by the Warren Police Department. He does not know how the
      audio was tampered with but he asserts the evidence once existed and no
      longer does. (Gill, p 28-29).

45.   Defendants supply the Court with three dashcam videos, Car 27 Barnhill,
      Exhibit B; Car 31, McKibben, Exhibit C, and Car S-1, Gill, Exhibit D.

46.   The Barnhill video has no sound. The camera captures whatever is visible
      looking through the windshield of Barnhill's car. He arrives at 11:15 and

encounters Pellow. At 11:17 the flashing lights of McKibben's car are seen, heralding his arrival. Between 11:17 and 11:38 the video does not capture anything significant, and with no audio Barnhill's actions cannot be documented. Exhibit B.

47.     The McKibben video has some surviving sound but is incomplete and appears to have been edited. At 11:15 McKibben activates his lights and siren, and rushes to the scene at high speed. He arrives at 11:17. Pellow and Barnhill walk right in front of McKibben's car and are briefly on camera. Barnhill violently shoves Pellow from behind but Pellow keeps his feet. McKibben exits the car and both officers are seen circling Pellow, and are heard telling him if he lies down he won't be hurt. Pellow is not running but he continues to try to get away. The three people pop in and out of view. Barnhill kicks at the back of Pellow's legs but misses. Barnhill appears to be aiming a spray device at Pellow's face. Pellow is heard, loudly but indistinctly, grunting and crying out off camera. McKibben and Barnhill are heard grunting and breathing heavily.

48.     At 11:21:13 Gill's vehicle arrives, overshoots the site of the fracas because his view is obstructed by a fire truck, stops and backs up. The fracas itself is not captured on this video.

49.     At 11:22:29 the body mike of McKibben stops working. At 11:23:14 it begins

working again. Exhibit C. *The silent 45 seconds corresponds with the exact*

*period when Gill contends he told McKibben to get off Pellow's back.*

50.     When the sound comes back on, indistinct voices are heard. A woman is

wailing, protesting what happened. McKibben is heard telling her "you

need to calm down." At 11:26:55 a male voice is heard asking: "You okay?"

At 11:28:00 a male voice addresses Gill, the only sergeant on the scene:

"Hey Sarge, we're gonna follow." At 11:29:29 McKibben's mike goes out

again and remains inaudible for the remaining 69 seconds of the video.

Exhibit C.

51.     The Gill video likewise is silent. It shows Gill approaching the scene just

before 11:21 with lights and flashers on. His arrival, overshooting the scene

and backing up, is captured at 11:21:13. Gill's vehicle is facing a long access

road. At 11:32 a fire truck with police escort exit in view of Gill's dashcam,

both with flashers activated. This is the transport of Pellow to the hospital.

Exhibit D.

52.     The digital files containing Exhibits B, C and D all state that they were "last

modified September 2, 2013." This is three days after the incident.

53.     It is Gill's custom and habit to write reports on the same day as an event.

An exception to this rule is the serious incident giving rise to a group debriefing. In such a case, he would wait until after the debriefing to prepare the report. (Gill, p 24).

54.    A report electronically signed by Arthur Gill and dated the next day, August 31, 2013, appears in the records of the Warren Police Department. Unlike all the others, it does not begin with the statement that "I was ordered as a condition of my employment by Captain Matheney to write this report." Ex 3. Gill insists he did not write it, and that an unknown forger had access to his password. He states the department as a general matter knew passwords. (Gill, 21-22).

55.    Although concerned about the incident, Gill eventually stopped pressing Matheney for a debriefing, and "after about two weeks and five, six, seven requests, I think it just sort of faded and we moved on." (Gill, p 27).

56.    Effective April 18, 2014 Gill was terminated by the Warren Police Department. Ex 10.

57.    On August 21, 2014, Gill emailed Lawrence Garner, executive lieutenant of the police department, James Moore, union president, his own attorney and others. The email is lengthy and is largely redacted, but it contains a paragraph describing Mr. Pellow's death following Officer McKibben's

standing on his back while prone and restrained. Ex 8. That email was

written before this case was anticipated, before any contact between Gill

and plaintiff's counsel, and is consistent with his later deposition

testimony.[2]

58.    Gill first had contact with plaintiff's counsel by phone on July 2, 2015. The

facts were not discussed. Gill was seeking a copy of the Complaint, because

he had not yet had any contact with defense counsel. (Gill, p 57).

59.    Defense counsel John Gillooly answered the Complaint on behalf of all

defendants, including Gill and McKibben, on June 2, 2015 despite the fact

---

[2]    The email reads: "G. There was an accident where a motor vehicle ran into a trailer on Doncea Street in the spring of 2013. Officers Kevin Barnhill and Shane McKibben responded to the scene. After several minutes these officers requested assistance and dispatch was unable to locate backup officers due to an unusually high amount of calls for service. I notified (sic) dispatch that I was several miles away but would be responding for assistance. When I arrived, the two police officers along with five or six firemen had a white male on the ground and it took several minutes to get the man cuffed. After cuffed, 240-pound Officer McKibben stood on the back of the arrested person while he was face down on the ground. I ordered McKibben to get off the man and noticed that he was having difficulty breathing and summoned fire personnel that had walked away. Captain Matheney responded to the scene and I informed him of the facts that I had to that point. I also advised Matheney of McKibben's actions and Matheny (sic) responded, "that never happened." Subsequently, the man died a short time later. Barnhill suffered an injury to a shoulder and was sent to the clinic. I spoke with Barnhill and McKibben over the next couple of work days and both officers stated they were upset and losing sleep over the incident. I suggested to Matheney that Barnhill and McKibben might benefit from speaking with a professional counselor/therapist. Neither officer received counseling assistance. Matheney also told me, McKibben and Barnhill that he would hold a debriefing with the three of us, but after several inquiries over several months, the debriefing never took place."

that neither he nor anyone from his firm had spoken with Gill who had no idea he was named as a defendant. [3]

60.    Gill made repeated calls to Gillooly's office. Eventually, on July 27, 2015, attorney Julie Druzinski sent him a copy of the Complaint which Gillooly had answered on Gill's behalf. Ex 9, # 10, 11, 13-15.

61.    Later attorney William Listman was retained to represent Gill In place of Gillooly.  It was not until May, 2016 that Gill could review the video, audio and written reports produced by the defense in discovery, ascertain that audio was missing and that someone had written a report in his name. (Gill, 29-31).

62.    Gill is awaiting an arbitration hearing in which he is contesting his discharge. He loved working for the City of Warren and expresses optimism that he will be exonerated and reinstated by the arbitrator. (Gill, p 56).

63.    All defendants refused to give any deposition testimony, on advice of counsel. Each cited his *Fifth Amendment* right not to give evidence against himself.

---

[3.]    In response to most paragraphs Gillooly pleaded a lack of knowledge of the facts. He had not spoken with Gill, but he had access to all his other clients. It is not clear when Gillooly realized he could not simultaneously represent McKibben and his accuser Gill.

## LEGAL ARGUMENT

I.    **Although Plaintiff Has the Burden of Proving Defendants are Not Entitled to Qualified Immunity, the Evidence Must Be Construed in a Light Most Favorable to Plaintiff.**

Summary judgment is only appropriate when the pleadings, discovery materials, disclosure material and affidavits reveal the absence of a genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c).* A genuine dispute exists when a reasonable jury could find for the nonmoving party. *Anderson v Liberty Lobby, Inc.,* 477 U.S. 242, 255; 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The moving party has the initial burden of identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v Hall Holding,* 285 F. 3d 415, 424 (6th Cir. 2002). The movant may satisfy this burden by showing "there is an absence of evidence to support the non-moving party's case." *Celotex Corp v Catrett,* 477 U.S. 317, 325; 106 S. Ct. 2548; 91 L. Ed. 2d 265 (1986).  Once the movant has satisfied this burden, "the non-moving party must go beyond the pleadings and come forward with specific facts to show there is a genuine issue for trial." *Chao,* 285 F. 3d at 424 *(citing Celotex,* 477 U.S. at 324).  The non-moving party, however, " must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative

evidence in support of its opposition to the motion for summary judgment." *Chao,* 285 F. 3d at 424.

When measuring Plaintiff's claims against this standard, the Court must also determine if the Defendants are entitled to qualified immunity. Under federal law, qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v Callahan,* 555 U.S. 223, 231; 129 S. Ct. 808; 172 L. Ed. 2d 565 (2009). The Court answers two questions: whether the defendant violated a constitutional right, and whether that right was clearly established at the time of the offense. *Pearson,* 555 U.S. at 232. The Court may consider these questions in any order, but if the answer to either question is "no," the defendant is immune from suit. *Id. at 236.* Plaintiff bears the burden of demonstrating that a defendant is not entitled to qualified immunity, although the Court must still construe the facts in a light most favorable to the plaintiff and draw all reasonable inferences in that party's favor. *Scott v Harris,* 550 U.S. 372, 377; 127 S. Ct. 1769; 167 L. Ed. 2d 686 (2007).

II.    **Defendants Cannot Contend a Police Officer Acts in an Objectively Reasonable Manner when he Stands on the Back of a Prone, Securely Restrained Person; Instead They Impermissibly Attack the Credibility of Plaintiff's Evidence.**

Nathan Pellow violently resisted the Defendants as they arrested, subdued and handcuffed him. There has never been any dispute about that. After a lengthy tussle Defendants succeeded. Pellow lay prone, handcuffed behind his back. He was no longer a threat. He was also still alive.[4] This case is about what happened after that.

Defendant Shane McKibben, injured in the fracas and perhaps angry and vengeful, did something so beyond the pale that not only he but all his co-defendants are not entitled to qualified immunity. He stood up on Pellow's back. He bounced on him. None of the others lifted a finger to stop him. Sergeant Gill, the ranking police official on the scene, alone intervened to order McKibben off

---

[4] Gill dep, pp 15, 61. In addition, Barnhill, McKibben, Roy, Adams and Van Horn all declined to give any deposition testimony on advice of counsel, claiming they face criminal jeopardy for their actions. At trial this should give rise to an adverse inference that the testimony they refused to give would have been contrary to their position. The court need not rule until trial on the adverse inference, but at the summary judgment stage it must make all reasonable inferences in plaintiff's favor. Defendants, by asserting their Fifth Amendment rights while seeking summary judgment, in essence suggest that no set of circumstances would cause the court at trial to permit the jury to do so. See *United States ex rel. Griffith v Conn, 2016 U.S. Dist. LEXIS 2089; 2016 WL 81765; Civil No. 11-157-ART, (E.D. Ky., Jan 7, 2016) ("In litigation, tactical decisions have risks. When a party decides to invoke the Fifth Amendment in a civil case, one risk is that the Court might draw an adverse inference against that party.")*

Pellow's back. What McKibben did was not only unnecessary, it was malicious. It squeezed the air and the life out of an already distressed Pellow.

Every trained police officer knows of the well documented risk of positional asphyxia. This is the classic case: an obese, out of breath man lying prone and handcuffed. McKibben is 6' 1", and weighs between 235 and 250 pounds. He was mad at Pellow, and must not have cared what happened to him.

Gill testified that it was a violation of established police procedure for McKibben to stand and bounce on Pellow's back. Gill, p 17. Even more telling, he testified to a cover up orchestrated by his superior officer, Captain James Matheney. Matheney came to the scene after Pellow died. He was the third ranking officer in the department. Informed by Gill of what McKibben had done, he immediately stated "that didn't happen." Gill, p 19. He put off the persistent Gill's requests to participate in a debriefing. He did debrief the others, and directed them to author reports but excluded Gill. Gill, p 19, 22, 23, 25, 27, 54; see Ex 2 at Bates 813 (Roy); 814 (Adams); 819 (Barnhill); 824 (McKibben) and 829 (Van Horn). Gill verified on the day of the event that his microphone captured both his direction to McKibben to get off Pellow's back and his report to Matheney of what happened. Gill, p 29. Despite this, the Gill audio has now disappeared and there is an unexplained absence of audio for McKibben for 45

seconds, from 11:22:29 to 11:23:14—the very time period in which Gill ordered McKibben off the back of Pellow. [5]

The autopsy, done the next morning, noted "the posterior torso shows a fresh bruise in the right lower mid-portion of the back." The medical examiner determined the cause of death was positional asphyxia. Ex 1, 6.[6]

It hardly matters what legal standard is used to measure the applicability of qualified immunity. Whether one uses the two-step inquiry of *Saucier v Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L Ed. 2d 272 (2001), the modified discretionary

---

[5] When suit was filed on May 18, 2015, Gill was not notified by the department or Garan Lucow, the law firm which handled most such suits. He learned of the suit from an officer and persistently called the Garan Lucow law firm for more than a month. Finally attorney Julie Druziniski sent him a copy of the lawsuit on July 27, 2015. Gill Declaration, # 13-15. On June 2, 2015 Garan Lucow answered the Complaint on behalf of Gill and all the present Defendants, but did so in an extraordinarily cautious way. The Defendants Answer, Docket No.10, seems to suggest defense counsel has no idea what the facts of the case are. Yet counsel would have known that joint defense of McKibben and Gill could not proceed since (1) Gill had long been accusing McKibben (in writing) and  (2) the other five defendants knew that Matheney had frozen Gill out of the debriefing while orchestrating a party line cover up in which they all participated. That, not any deficit in Garan Lucow's commitment to client service, explains why defense counsel avoided talking to Gill. How did defense counsel know to avoid talking to one their six clients? A jury would be justified in believing that defense counsel knew from speaking with their other clients, who remembered what had happened and the systematic freeze out of Gill orchestrated by Captain Matheney beginning on the day of the incident. Later, Garan Lucow consented to attorney William Listman's substitution as counsel for then-still-a-defendant Gill. Whether that action was enough to address the conflict need not be considered at this time. Defendants asserted at deposition that they invoked their Fifth Amendment rights on Garan Lucow's advice.

[6] The police photographer also took photographs of Pellow's corpse at the hospital, within a few hours of his death. These pictures depict bruising on his back consistent with Gill's testimony of McKibben's actions. Ex 6.

inquiry of *Pearson v Callahan*, 555 U.S. 223; 129 S. Ct. 808; 172 L. Ed. 2d 565 (2009*); or the three-step inquiry set forth by the Sixth Circuit in *Feathers v Aey,* 319 F. 3d 843 (6th Cir. 2003) *("whether the plaintiff has offered sufficient evidence 'to indicate what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."),* qualified immunity cannot be available.

Defendants concede "Sixth Circuit case authority is equally clear that police officers may not use force against a suspect once he is compliant, subdued, no longer resisting, or securely detained," citing *Hagans v Franklin Cnty. Sheriff's Office,* 695 F. 3d 505, 509 (6th Cir. 2011). They dismiss as not worthy of discussion the testimony of Arthur Gill, the 45 second gap in the McKibben audio, the fact that the digital files presented to this court were modified three days after this event, and the striking fact that all defendants invoked their Fifth Amendment protections against self-incrimination. According to them, any less charitable characterization of the facts must be "blatantly contradicted by the record" and "no reasonable jury could believe it." On this premise they contend, despite having taken refuge in the Fifth Amendment, that they are protected by qualified immunity. Defendants are wrong.

This is not an inquiry into what is or is not excessive force. Defendants ask

20

the Court to find, even in a case where all Defendants have taken refuge in the Fifth Amendment, that Gill's version of events, and the other evidence supporting it, is so untenable as a matter of law that no jury could believe it. The legal perimeters of the doctrine of qualified immunity beg the question.

The self-incrimination privilege in the Fifth Amendment was enacted as a shield against tyranny. Defendants, ironically state actors, seek to use it as a sword. Defendants caused a citizen's death through the use of clearly excessive lethal force after he had already been subdued. After that, someone in the Warren Police Department tampered with the evidence and arranged a cover up involving everyone but Gill. These actors do not enjoy qualified immunity because (1) bouncing on Pellow's back after he had been subdued created a known major risk of positional asphyxia; (2) McKibben took this action in plain view of all the other defendants, none of whom verbally or physically intervened; (3) a debriefing was held after Pellow's death but Gill, the only person who did intervene to get McKibben off Pellow's back, was excluded; (4) following this debriefing all the defendants wrote reports "at the direction of" Captain Matheney, who had dismissed Sergeant Gill's eyewitness report of McKibben's conduct; and (5) the invocation of self-incrimination privilege could give rise to an adverse inference that the testimony of defendants would favor plaintiff. *See*

*e.g. Lawrence v Madison County*, 2016 US Dist. LEXIS 44089 *21 (ED KY 3/31/2016) quoting *Baxter v Palmigiano*, 425 US 308, 318 (1976).  *See also*, *McKinney v Galvin*, 701 F2d 584, 589 (6th Cir 1983).

Gill listened to his audio that same day, after Pellow's death to verify that his order to McKibben had been secured. It captured his order to McKibben ("get off his back") and Captain Matheney's dismissive response to his report ("That didn't happen.") That evidence has mysteriously (and conveniently) disappeared. Defendants tell the court the Gill audio never existed, and give the court a McKibben audio with a critical gap. The digital media files were last modified September 2, 2013, three days *after* this event.

If the defendants conspired to obstruct justice by (1) forging a report in Gill's name; (2) redacting the audio of Barnhill and Gill and editing the audio of McKibben three days after the event; and (3) lying in police reports about having done so, their reluctance to testify in this civil case is understandable because such behavior violates the criminal law. They have a constitutional right not to testify, but they do not enjoy qualified immunity.

### III. Far From Demonstrating the Absence of a Genuine Issue of Material Fact, Defendants Raise More Questions Than They Answer

Defendants devote the majority of their brief to the reasonableness of their

conduct in subduing Pellow. Beginning at page 19, they tiptoe into the thicket. They try to explain why the Court should accept their version of all disputed facts. Not only does this approach upend traditional summary judgment review, it reveals that genuine issues of material fact abound.

Defendants argue (1) Gill testified all the officers other than McKibben left the area **and returned to the ambulance/firetruck, approximately 100 to 150 yards away, when Officer McKibben allegedly bounced on Mr. Pellow's back. (Gill, pages 14-16, 43.) (**Emphasis supplied by Plaintiff); (2) the firefighters testified to a different version of events than did Gill; (3) there is no audio verifying Gill's version of events; (4) the video of Gill's car shows the audio was never recorded in the first place; (5) the CLEMIS system's audit trail shows "Gill" logged in twice on August 30, logged in and viewed his page on August 31, and updated his report on Sept 1; (6) the Warren Police Department does not know or retain officers' passwords for CLEMIS; (7) if an officer's password for CLEMIS needs to be reset an IT employee will reset it to a generic default password and the officer is then able to reset the password himself; and (8) the audit trail reveals no change in Gill's password between January 25, 2013 and December 5, 2013.

Plaintiff has produced evidence challenging all eight of these supposedly

invincible points. Not only that, rather than discuss any of these issues at deposition, the Defendants claimed their answers might tend to incriminate them.

**1. Gill's deposition testimony does not establish that Barnhill and the Bystander Defendants retreated a distance of 100-150 yards after Pellow was subdued, and thus could not have bystander liability.**

The Court need only read pages 14-16 and 43 of the Gill deposition to dispose of this question. Gill testified that after Pellow was subdued, "Everyone started getting off Mr. Pellow." One of them complained of being bitten. "Everyone had just started walking away."

This is a reference to Barnhill and the firefighters, not the Bystander Defendants. Defense counsel takes this testimony out of context and utterly mischaracterizes it. When Gill examined Pellow after forcing McKibben to dismount from his back, he observed purple face color (it had been red) and gasps (in place of heavy breathing). He ran to the firemen, not the officers, whose vehicle was some distance away. See Gill, p 16. He does not say it is 100-150 yards away, only that the firefighters "all ran over to Mr. Pellow, loaded him up and took him away."

At page 43 Gill refers to he personally having run 100-150 feet, not yards, to Mr. Pellow. This was when he first arrived: he drove by the scene because his

view was obstructed. Perhaps this is the source of defense counsel's confusion.

Gill immediately ordered McKibben to get off Pellow's back as soon as he saw the situation. Gill, p 15. The others, all standing nearby, did nothing verbally or otherwise to stop their fellow officer from bouncing on Pellow's back. Bystander liability attaches to each of them. *Kent v Oakland County*, 810 F. 3d 384 (6th Cir. 2016) is a recent addition to a line of Sixth Circuit taser cases, which is instructive in this context for its holding on bystander liability.[7] Kent, a physician living in Michigan, hosted his dying father, who lived some distance away, in his home. The elder Kent had signed a living will directing that he not be resuscitated, but he had left the paperwork at his home while visiting his son. While his son's guest, he expired. The son observed that his father was dead and called non-emergency authorities to report the death. EMT's and two deputies, Lopez and Maher, arrived. The EMT's wanted to attempt resuscitation, unwilling to accept the son's explanations in the absence of paperwork. The situation escalated. Kent vehemently objected to the EMT's efforts to attach an AED to resuscitate his father. When Kent yelled at the deputies and refused to calm down as commanded, Deputy Lopez tased him. The District Court concluded this was

---

[7] Although tasers were used multiple times on Pellow, Plaintiff does not claim the decision to tase him was objectively unreasonable.

objectively unreasonable and denied summary judgment. The Sixth Circuit reached the same conclusion and affirmed. Significantly it held jury trial could proceed as to Deputy Maher, who had failed to speak up and prevent Deputy Lopez from tasing Kent:

> ...*Deputy Maher is not entitled to qualified immunity....Since Deputy Lopez's use of the taser under these facts constituted excessive force.....it follows that Maher 'had reason to know that excessive force would be or was being used.'* Citations omitted. *Maher also had 'the opportunity and the means to prevent the harm from occurring."* Citation omitted. *She was in the bedroom for the majority of the incident, communicated with Lopez as the events unfolded, and was facing Kent when she heard Lopez warn Kent that he would use the taser. She was close enough to handcuff Kent immediately after the laser was deployed......Kent has presented sufficient evidence to give rise to a jury question as to whether a reasonable officer in Maher's position would have observed Deputy Lopez's use of the laser and would have taken action to prevent Lopez from applying it.*

*Kent, at p 16.*

The record is not fully developed as to (1) the exact location of Barnhill and the Bystander Defendants when McKibben was bouncing on Pellow's back, (2) the actions of the Bystander Defendants as the incident unfolded, and (3) what conversation or other interaction took place between McKibben and the others during and after the incident. Defendants created this state of affairs by taking the *Fifth Amendment*. Why, if the Bystander Defendants had no role in this episode and were over 100 yards away when it happened, did they take the *Fifth*

*Amendment*? An inference not only can be made, but should be made, that if they testified truthfully it would assist Plaintiff. *See, Baxter supra.*   It must be remembered that they participated in the Matheney debriefing which froze out Gill. Could it be they do not care to discuss what happened afterward?

While the court need not decide how to proceed with regard to adverse inference before trial, in making all inferences in favor of the non-moving party it should infer that the Defendants are hiding something. Plaintiffs are not resting on a vacuum of proof. They have obtained eyewitness testimony from the supervising sergeant of the Defendants. It is incumbent upon Defendants not to hide behind the Fifth Amendment but to explain themselves. If they don't, they deserve to have the court make adverse inferences.

**2.  The firefighters testified to a different version of the facts than did Gill.**

The firefighters are not defendants. They are co-employees of the City of Warren. One of them, Jacobs, was punched in the face by Plaintiff's decedent. Conflicting eyewitness testimony is common in litigation. The jury should evaluate their credibility.

Gill's testimony is corroborated by substantial other evidence. He recalled overshooting the fracas, stopping and backing up. This is captured on both the McKibben video, Exhibit C, and the Gill video, Exhibit D, at 11:21:13. He said

Pellow was quickly subdued after his arrival. McKibben's body mike stops for 45 seconds beginning at 11:22:29, coming back on at 11:23:14. Within a few minutes Pellow is being transported. A wailing woman is heard protesting that Pellow was mistreated, and is told by McKibben that "you need to calm down." Pellow's corpse has bruises on his back, photographed by the police at the hospital and noted on autopsy by the medical examiner. The cause of death, positional asphyxia, exactly tracks Gill's observations and testimony. The dashcam video files were modified three days after the incident. A jury would not be acting irrationally if it believed Gill.

### 3. The Vanished Audio Confirming Gill's Version of Events Is Suspicious and Likely Explains Defendants' Election to Invoke the *Fifth Amendment*

Even before Gill was provided a copy of Commissioner Green's affidavit, he testified that (a) Captain Matheney seemed intent from the beginning to whitewash the death of a citizen at the hands of Officer McKibben (Gill, p 19); (b) he was therefore intent on securing all three videos and audios on the day of the incident (Gill p 29); (c) he listened to his own audio and confirmed that it recorded both his direction to McKibben to get off Pellow's back and his statement to Matheney and Matheney's "it didn't happen" response; (d) he was not invited to the promised debriefing although it appears the others were because their

reports begin with the words "As a condition of my employment I am directed by

Capt Matheney to make this report (Gill, p 54); (e) he made no report, because it

was protocol to await the debriefing in such a serious case before reporting (Gill,

p 54); (f) a report electronically signed by him is now in the record but he did not

write it (Gill, p 21-22); (g) he doesn't know who forged the report, which does not

begin with the words "As a condition of my employment I am directed by Capt

Matheney to make this report."  As a general matter the department knew his

password which would enable another person to log on as him and make a report

in his name (Gill, p 21-22); he does not know how the audio was tampered with

but is 100% certain it previously existed (Gill; p 28-29); and he emailed the same

version of the Pellow incident to a city official and others on August 21, 2014

before the lawsuit was filed or threatened.

Gill has been provided a copy of Green's affidavit. Gill's Declaration, Ex 9,

makes  the following additional points:

- Gill has exceptional academic and other credentials to be a police officer. Gill Declaration, ¶ 4.

- Gill was in charge of the Technical Services Divison (TSD) of the department between September, 2011 and January, 2013. Gill Declaration, ¶ 5.

- Commissioner Green made numerous requests for information but displayed no working knowledge of any TSD systems, calling into question

his assertion that his 2016 affidavit comes from "his personal knowledge." Gill is much more tech savvy than Green. In this case the jury should hear from both and evaluate Green's explanation. Gill Declaration, ¶ 5.

- The VisionHawk system automatically triggers the body mike whenever the lights or sirens are activated. Gill said the same thing in his deposition, at page 30 and 39. He wouldn't have to activate a "transmitter" button to turn on his mike. Gill Declaration, ¶ 6-7. It appears the Gill video, Car S-1 Defendants' Exhibit 4, does not start until after the lights and siren were activated, so of course the video doesn't show Gill turning on his mike. Gill Declaration, ¶ 7.

- Green's contention that no one in the department could have known his password is directly contradicted. Gill names two IT workers, Shapiro and Crabtree, who would be contacted by officers if they had forgotten their passwords. It follows Shapiro and Crabtree knew Gill's never changed, easy-to-remember password, spartans7. Gill Declaration, ¶ 8.

These circumstances are suspicious. Gill told his superiors what had happened. He was frozen out of debriefing, in which the others settled on a version of this story. He was fired. He and five others were sued. Green and Matheney knew this was trouble, because (1) Gill was contesting his recent firing; (2) in the course of contesting his firing, on August 21, 2014, he had emailed his version of the Pellow case, which conflicted with the party line; (3) there was an obvious conflict of interest asking Garan Lucow, usual defense counsel, to represent Gill and the others; (4) nonetheless Garan Lucow filed a murky, non-committal answer on behalf of parties (without speaking to their client, Gill or even providing him a copy of the Complaint) in conflict then counseled everyone

but Gill to take the Fifth Amendment; (5) Gill eventually ended up with an unconflicted lawyer, gave deposition testimony consistent with his 2014 email and his earlier statements to Matheney; but in the meantime (6) Gill's audio disappeared, even though he activated his lights and siren which automatically automates the body mike and actually listened to the audio portion of the video which captured his exchange with McKibben. The jury would not have to employ adverse inferences to believe that Gill's audio functioned, captured the statements he testified to, and was tampered with to cover up McKibben's killing of Pellow.

### 4. Gill's Video Does Not Prove the Audio Was Never Turned On By Gill.

The activation of lights or siren automatically turns on the audio. The video provided does not go back far enough to capture the moment when Gill turned on his lights and siren, thus activating his mike, but it does reveal Gill has activated lights and siren as he drives to the scene. Ex 9, at ¶7. Green, not tech savvy, cannot explain the operation of these systems and his affidavit cannot be from personal knowledge. Cross examination at trial would expose his lack of knowledge or expertise. Ex 9, at ¶5.

To reiterate, the Defendants took the *Fifth Amendment* rather than confirm in their depositions that activating lights or sirens automatically activates the

microphone. Rather than risk waiving their *Fifth Amendment* privilege they proffer an affidavit on the workings of technology by Green, who knows little or nothing about the workings of technology.

### 5. The CLEMIS Audit Trail Does Not Establlish That Gill Wrote His Report On August 31, 2013.

See 4 above. See Ex. 9,  ¶8. See Gill dep, p 21-22.

### 6. The Warren Police Department Knew Gill's Password.

The two IT functionaries, Shapiro and Crabtree, knew officers' passwords, at least until officers saw fit to change them. (Ex 9, ¶8; Gill dep, p 21-22). Gill never changed his password, so anyone in authority could get it from Shapiro or Crabtree, if they didn't already know it from watching him log on. The audit trail only establishes that someone logged on as Gill using his password. Defendants, accused of mendacity, contend it had to be Gill. Gill, who knows what he did and didn't do, denies it. The Defendants took the *Fifth Amendment*. Gill should be believed. At the very least, this presents a genuine issue of material fact for a jury, which would not be acting irrationally to believe Gill rather than the Defendants.

### 7. The Ability of IT To Reset An Officer's Password To A Generic Password Supports Gill's Contention That Someone Forged "His" Report.

How does IT reset an officer's password if it doesn't know the existing

password? This assertion supports Gill's contention that someone in authority forged his report. The officer could change it and keep the new password private, but Gill never did that. Green's affidavit cites the CLEMIS audit trail for the proposition that Gill never changed his password. Gill, an MSU graduate, kept the same basic password at all times, "spartans7". This fact could have been obtained from Shapiro or Crabtree, the IT functionaries. Or someone could have observed him logging on.

### 8. The Audit Trail Confirms No Change Was Made In Gill's Password, But This Fact Does Not Assist Defendants.

Until he changed it, he was vulnerable. The regime knew the password. Once he changed it he would be safe, but he never did. This evidence, far from proving Gill wrote the report that bears his name, supports the opposite conclusion. This case teems with grist for a jury.

### CONCLUSION

If McKibben stood on Pellow's back, caused him to stop breathing and die, while his fellows Barnhill and the Bystander Defendants did nothing to stop him and helped cover it up later, none of them enjoy qualified immunity. Plaintiff has produced admissible evidence which a reasonable jury could believe. That is an understatement: police officers who invoke the *Fifth Amendment* to avoid

testifying and offer lame, manufactured explanations for disappearing evidence allow this Court to conclude that Defendants engaged in unlawful conduct which, in this case, killed Pellow.

It cannot be said that no factual development would support recovery. Defendants are not immune, because it was well established that using deadly force on a safely restrained prisoner violates his constitutional rights. Plaintiff has met her burden of presenting admissible probative evidence to establish a genuine question of fact to defeat summary disposition.

<div style="margin-left: 40%;">

Respectfully submitted,

_/s/ Ben M. Gonek_____
BEN M. GONEK (P43716)
Attorney for Plaintiff
500 Griswold Street, Suite 2450
Detroit, MI 48226
(313) 963-3377


_/s/ Joel B. Sklar_____
JOEL B. SKLAR (P38338)
Attorney for Plaintiff
500 Griswold Street, Suite 2450
Detroit, MI 48226
(313) 963-4529

</div>

Dated: January 9, 2017